No. 75,834

RICHARD B. YORK and VESTA L. YORK, Husband and Wife, *Appellees/Cross-appellants*, v. INTRUST BANK, N.A., a federally chartered banking corporation, *Appellant/Cross-appellee*, and LOST CREEK ESTATES, INC., a Kansas corporation; J.W. RUSSELL; MARGE DELMAR; PLAZA DEL SOL REAL ESTATE, INC., a real estate firm; SHARON WEST; BREEZY LAKE HOMEOWNERS ASSOCIATION, a nonprofit corporation; and THE ARCHITECTURAL CONTROL COMMITTEE FOR BREEZY LAKE HOMEOWNERS ASSOCIATION, *Defendants*.

(962 P.2d 405)

274

Opinion filed June 5, 1998.

*Thomas D. Kitch*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, argued the cause, and *Lyndon W. Vix* and *Kent A. Meyerhoff*, of the same firm, were with him on the briefs for appellant/cross-appellee.

*Lee H. Woodard*, of Woodard, Blaylock, Hernandez, Roth & Day, of Wichita, argued the cause, and *John L. Carmichael*, of Wilson, Lee & Gurney, of Wichita, was with him on the briefs for appellees/cross-appellants.

The opinion of the court was delivered by

LARSON, J.: This is a multiple issue appeal and cross-appeal raising questions of fraud, conspiracy, aiding and abetting, violations of the Kansas Consumer Protection Act (KCPA), release, both compensatory and punitive damages, remittitur, pro tanto credit for settlements, and attorney fees.

Highly summarized, the issues we consider arose when Richard York and his wife, Vesta, sued numerous defendants in connection with activities arising out of undisclosed and hidden real estate and construction commission obligations on their purchase of a resi-

dential lot in a subdivision in Wichita, Kansas. Several defendants obtained summary judgment prior to trial, while others entered into a settlement agreement with the Yorks.

The Yorks' claims against the seller of the lot, InTrust Bank, N.A. (InTrust), proceeded to trial, and the jury awarded the Yorks actual damages of $113,411 and recommended punitive damages. InTrust moved for judgment notwithstanding the verdict, a new trial, or, in the alternative, a remittitur, plus credit on the judgment for amounts received by the Yorks in settlement.

After an evidentiary hearing, the trial court reduced the actual damages to $44,300, awarded attorney fees and costs of $46,383.28, and granted the Yorks punitive damages of $7,500, making a total award of $98,183.28. The court then entered a separate order crediting InTrust with the entire amount of a $65,000 settlement the Yorks received from other defendants, leaving InTrust responsible for a $33,183.28 judgment. The Yorks consented to the remittitur. InTrust did not and appealed, alleging error in various rulings of the trial court and insufficiency of the evidence supporting the verdict and damages. The Yorks then cross-appealed the remittitur order and the order crediting the amount received from the settlement agreements against the verdict.

The issues raised by the appeal and cross-appeal are as follows:
1. Did the trial court err in ruling InTrust was not released due to the covenant not to sue between the Yorks and the settling codefendants?
2. Did the trial court err in ruling InTrust was a "supplier" under the KCPA?
3. Was there substantial competent evidence that InTrust violated the KCPA?
4. Was there substantial competent evidence that InTrust conspired with or aided and abetted any other party in defrauding the Yorks?
5. Are the Yorks barred from cross-appealing the amount of damages due to their acceptance of the remittitur prior to InTrust filing a notice of appeal?
6. Was the amount of damages awarded to the Yorks appropriate?

A. Should the actual damages be limited to the amount of the build-job commission?

B. Was there substantial competent evidence to support a punitive damages award?

C. Was the amount of attorney fees awarded to the Yorks excessive?

7. If the Yorks' cross-appeal may be heard, the following additional questions exist:

A. Did the trial court err in granting a remittitur?

B. Did the trial court err in granting InTrust a pro tanto credit for the full amount received from the settlements with the other defendants?

C. Is InTrust entitled to an additional pro tanto credit for amounts received from the Yorks' settlement with the other defendants who had previously been granted summary judgment?

D. Should InTrust be precluded from receiving any credit for the settlement amounts paid to the Yorks?

E. Is InTrust entitled to a credit for the settlements with the other defendants against the amount of punitive damages assessed against it?

8. What amount, if any, should the Yorks be allowed for their attorney fees on appeal?

*Factual statement*

The complexity of the issues set forth above points to the necessity of a more detailed statement of the various relationships between the parties, as well as the transactions, which are central to this appeal.

InTrust, in the regular course of its banking business, takes real estate as collateral for loans. It is occasionally required to sell this real estate when it receives title as the result of defaulted loans. In the present instance, InTrust took a deed in lieu of foreclosure and thereby acquired land in a residential development, Lakeside Estates.

At the time InTrust acquired the Lakeside Estates property, it was being developed in two phases. Some homes had been constructed on Phase I, but the plat for Phase II had not been filed.

InTrust officers Eastwood, Sayler, and Bunton determined the bank would recover the most money on its security by developing the property and selling individual lots over a 5- or 6-year period.

InTrust entered into negotiations with Jay Russell and his company, Lost Creek Estates, Inc., (collectively Russell) to develop Lakeside Estates. Russell was to be compensated by a development fee of 15% of the gross sales price for each Lakeside Estates lot sold. The parties entered into a written agreement in October 1992, which provided that no real estate commission would be paid by InTrust on the sale of lots. Russell had previously sent Sayler a memorandum recommending that the approved builders pay real estate commissions of 6% based upon the total sale price of the homes to be built on the lots. Eastwood testified he initially understood Russell would pay any real estate commissions out of his 15% development fee, but was informed by Russell that the commissions would be paid on the individual build jobs rather than by him.

Russell then entered into an agreement with Marge Delmar and her company, Marco Realty (collectively Delmar), giving Delmar the exclusive right to market the lots in Lakeside Estates. The agreement provided that no real estate commission would be paid by InTrust or Russell on the sale of any lot and that any commission due would be paid by the exclusive builders of Lakeside Estates on any homes they constructed on the property in the subdivisions.

Russell also granted four builders the exclusive right to build homes on the Phase I and Phase II Lakeside Estates lots. He entered into a builder's agreement with each, requiring the builders to pay Delmar, as the exclusive marketing company, a 6% commission based upon the cost of a built home. These agreements contained a confidentiality clause prohibiting disclosure of the terms of the contract to third parties, with the exception of lenders. The builders also signed exclusive right-to-sell agreements with Delmar, granting Delmar a 6% commission on the total cost of any speculative homes they constructed when sold.

By April 1993, InTrust was selling Lakeside Estates lots and executing contracts with the purchasers. These contracts were on a preprinted form provided by Delmar, with paragraph 25 of the

agreement to be separately signed by all parties, stating: "This office, as a real estate brokerage firm, solicits real property listings from the seller. Since the seller pays our commission upon a sale closing, by law, we have a fiduciary responsibility to that seller."

In addition, Paragraph 14.A. of the agreement provided:

"This contract and any Builder Agreement between the parties hereto contain the entire agreement between Seller and Buyer and may not be amended or modified except by written agreement signed by Seller and Buyer. All statements and representatives [sic] made by the parties concerning the Property are set forth in this Contract and such Builder Agreement. No statement or representation not set forth herein or therein shall be binding on or enforceable against Seller or Buyer."

Eastwood was responsible for signing these contracts on behalf of InTrust. He testified to reading the first contract before signing. When Eastwood questioned Delmar about the statement regarding the payment of the real estate commission in the agency disclosure notice, he was informed that InTrust was paying a commission by paying the development fee to Russell.

With the foregoing background in existence, the Yorks began looking for a lot upon which to build a new home in 1993. They decided to purchase a lot in Lakeside Estates, met with Delmar, and agreed that Sharon West of Plaza del Sol Real Estate, Inc., (collectively West) would be involved as a cooperating realtor.

In August 1993, the Yorks and InTrust entered into a lot purchase contract for the sale of a lot for $30,500, with the agreement executed by the Yorks, Eastwood on behalf of InTrust, Delmar, and West. No builder's agreement was entered into, nor were copies of the builder's agreements between Russell and the exclusive builders provided to the Yorks. West presented the Yorks with a separate agency disclosure which stated her commission would come directly or indirectly from the seller.

Richard York testified that at the time of the purchase, he believed InTrust would be paying the real estate commission based on the selling price of the lot out of the proceeds of the sale. He understood that a realtor would be paid a commission on the basis of what he or she sold, be it a lot or a model or speculative home. He testified that had he known InTrust was not paying a commis-

sion on the sale of the property, he would have made further inquiry regarding the commission arrangement. He stated he would not have completed the contract had he known that the commission would be based on the cost of a custom home to be built on the property by York and his wife rather than on the lot price.

The Yorks' purchase of the property was set to close on October 29, 1993. The Yorks sold their home through West and moved into a rented duplex on September 29, 1993. On August 31, 1993, West informed the Yorks that Delmar had told her that neither she nor Delmar would receive a commission from InTrust, but rather that the builder would add the commission to the cost of the build job. The Yorks were surprised by this information and pointed out the agency disclosure clause in their purchase contract indicated that the seller, InTrust, was paying the commission. Richard York told West she was to be paid by InTrust, they would not pay a commission at a later time, and she needed to get this taken care of. York testified West indicated she agreed with him as to what the purchase contract said, and the matter was not mentioned again by West prior to closing.

Prior to closing on the lot, the Yorks met with the approved builders, then sought an architect to draw up blueprints for a custom home. The Yorks decided to deal directly with the builders rather than working through an agent and believed that neither West nor Delmar needed to be involved in the process, as the agents would not be providing any services. The Yorks then obtained a loan commitment, locking in an interest rate of 6% on a loan for $164,400, for a 15-year term, provided they closed on the transaction within 6 months. The Yorks paid a nonrefundable fee of $1,989 to obtain the commitment.

The Yorks inquired about extending the closing date on the purchase of the lot, but were advised by West that this could not be done. The closing statement did not reflect any deductions for a real estate commission. York testified this did not lead him to believe no commission was being paid by InTrust because he understood there were many methods in which the seller may pay a commission.

On November 1, 1993, the Yorks received a bid on the custom blueprints from builder Tony Zimbleman of $281,000, which included an itemized commission of $16,860. Four days later they received an unitemized bid from builder Mike George of $303,212. The Yorks attempted to discuss the commission with Zimbleman, but were simply told that was the way it worked. Richard York then obtained lower bids from suppliers and subcontractors so that they could proceed with Zimbleman supervising the construction for a flat fee.

On December 2, 1993, Zimbleman gave the Yorks a copy of the exclusive listing between Russell and Delmar, and the next day he gave them a blank copy of the builder's agreement he had signed with Russell. The Yorks sought advice from counsel, who wrote to Delmar on December 14, 1993, suggesting she had entered into a secret agreement in violation of the law. On December 16, 1993, Zimbleman wrote to the Yorks and withdrew as builder of their home. Zimbleman later told the Yorks he could build their home in a development other than Lakeside Estates, but would not build for them there at that time.

On December 28, 1993, the Yorks' attorney offered to release InTrust from liability and relinquish any claim to the property if it would refund the purchase price of the lot and any closing costs. InTrust responded by contending the purchase contract did not impose any responsibility on the bank regarding future construction arrangements. InTrust continued to execute purchase contracts that were essentially unchanged from the contract entered into with the Yorks.

The Yorks sued InTrust, Russell, Delmar, West, and the Lakeside Homeowners Association and Architectural Control Committee in March 1994. Shortly afterwards, the Yorks offered to put the commission Delmar sought in escrow pending the result of the lawsuit so they could start building their home and mitigate their damages. Delmar never accepted this offer.

In July 1994, the Yorks discovered Lakeside Estates was no longer using exclusive builders. The Yorks received permission from Russell to use a builder of their choice with no commission due Delmar, whose company was no longer the marketing com-

pany for Lakeside Estates. The Yorks obtained another loan commitment from the same lender as before, which agreed to apply their prior fee of $1,989 towards the new loan. However, the new loan commitment was for a 30-year loan for 8¼%, which could adjust up to 8¾% by the end of the commitment period, and the beginning interest rate was locked in for 7 years, after which it could increase by 2% per year up to a maximum rate of 14½%.

After discovery, summary judgment was granted to West, the Lakeside Homeowners Association, and the Architectural Control Committee, but denied to InTrust, Delmar, and Russell. The court granted the Yorks' motion to amend their complaint to assert punitive damages. Shortly before trial, the Yorks settled with Delmar and Russell for $65,000, granting them a covenant not to sue.

The trial court submitted to the jury the Yorks' four claims against InTrust for fraud, civil conspiracy, aiding and abetting, and violation of the KCPA. The jury was also instructed to determine whether punitive damages should be allowed.

The jury found against InTrust on all claims except that of fraudulent inducement to purchase the lot and awarded damages of $96,111 for increased mortgage interest, $11,750 for increased construction costs and contractors' fees, $4,200 for temporary housing, and $1,350 for lost mortgage interest income tax deductions, totalling $113,411. The jury also determined that punitive damages should be awarded.

InTrust moved for judgment notwithstanding the verdict (JNOV), a new trial, or a remittitur. The Yorks moved for assessment of punitive damages, attorney fees, and costs.

Evidence of InTrust's financial condition and the amount of reasonable attorney fees was presented. The trial court denied InTrust's motion for JNOV, but ordered the Yorks to either accept a remittitur of damages to $44,300 or undergo a new trial on the issue of damages. The Yorks accepted, and the court reduced the amount of damages for increased mortgage interest to $27,000 and added in the remaining damage amounts to reach the $44,300 figure for actual damages.

The court also awarded punitive damages of $7,500, attorney fees of $45,000, and costs of $1,383.28. The court then entered a

separate order crediting InTrust the entire amount of the $65,000 settlement with Russell and Delmar and entered a judgment against InTrust for $33,183.28.

InTrust elected not to accept the remittitur it had requested and filed a timely appeal. The Yorks cross-appealed. The Yorks also appealed the trial court's grant of summary judgment in favor of West, but later dismissed the appeal after a settlement was reached. Our jurisdiction is pursuant to K.S.A. 60-2102(a)(4) in a case transferred to us under K.S.A. 20-3018(c).

*Was InTrust released by the settlements with Delmar and Russell?*

InTrust raises a threshold issue that it is only vicariously liable as a conspirator or aider and abettor and that the Yorks released it from liability by settling with codefendants Russell and Delmar and executing a covenant not to sue. InTrust's contention relies on the rule that the release of a party who wrongfully injures another operates to release all those derivatively liable for the conduct of the party actually released.

The effect of a release or covenant not to sue is a legal question. *Sade v. Hemstrom,* 205 Kan. 514, 522, 471 P.2d 340 (1970). We have unlimited review over questions of law. *KPERS v. Reimer & Koger Assocs., Inc.,* 262 Kan. 635, 643, 941 P.2d 1321 (1997). However, insofar as factual matters pertain to InTrust's role as either an active or passive tortfeasor, which has bearing on the legal question of the effect of the settlement, we must apply a mixed standard of review. Thus, we apply a substantial competent evidence test to the factual findings and then decide if those findings support the legal conclusions. See *State Bd. of Nursing v. Ruebke,* 259 Kan. 599, 611, 913 P.2d 142 (1996).

The law is well settled in Kansas that the execution of a covenant not to sue does not result in a release of claims against all other joint tortfeasors. *Jacobsen v. Woerner,* 149 Kan. 598, 601, 89 P.2d 24 (1939). InTrust does not dispute this rule or claim the document given by the Yorks to Delmar and Russell is a release and not a covenant not to sue.

InTrust's contention that the Yorks' settlement with Delmar and Russell had the effect of releasing it from liability is premised on

the holding of *Atkinson v. Wichita Clinic, P.A.*, 243 Kan. 705, 707, 763 P.2d 1085 (1988), that a release or covenant not to sue an agent also releases the principal. *Atkinson* involved a medical malpractice action against a doctor for negligence and his employer for imputed liability based on the doctrine of respondeat superior. We decided that a settlement with the doctor which included a hold harmless agreement insulating the doctor from any liability also satisfied any imputed or vicarious liability of the employer to the plaintiff. 243 Kan. at 714.

The Yorks do not disagree with the *Atkinson* rule, but simply contend it is not applicable in our case because InTrust actually participated in the wrong that harmed the Yorks. The Yorks point out the jury had to have found that Intrust acted independently and willfully in determining it violated the KCPA and in further finding that punitive damages were appropriate. Based on the instructions, the Yorks contend the jury found InTrust acted "with a designed purpose or intent . . . to do wrong or to cause an injury to another."

If the liability of InTrust is purely vicarious within the meaning of the cases cited in *Atkinson* (see *Jacobson v. Parrill*, 186 Kan. 467, 351 P.2d 194 [1960], and *Wilkerson v. Lawrence*, 193 Kan. 92, 391 P.2d 997 [1964]), the covenant not to sue would have the effect of discharging InTrust from liability notwithstanding the express clause stating the "Yorks expressly reserve the right to further prosecute the lawsuit against defendants InTrust Bank, M.B., Sharon West, and Plaza Del Sol Real Estate, Inc." If, however, the Yorks may successfully hold InTrust independently responsible for its own actions and not merely for the conduct of other actors, the covenant not to sue has no effect on InTrust's liability.

We do not appear to have any Kansas cases exactly on point, although the distinction between the arguments of the parties is partially shown by the result in *Wilkerson*,193 Kan. at 96, where it was held that the release of one agent released the principal's vicarious liability for that agent's actions, though the principal may still have had vicarious liability for a different agent's negligence.

InTrust relies on the Oklahoma case of *Barsh v. Mullins*, 338 P.2d 845 (Okla. 1959), to support its assertion that passive tortfea-

sors are released by a covenant not to sue active conspirators. *Barsh*, however, recognized a distinction not merely between active and passive conspirators, but also between an injury that is the object of a conspiracy and one that occurs incidentally while in the furtherance of the conspiracy. The court stated, albeit in dicta:

"It is not necessary for us to determine whether the liability of a non-acting conspirator would be primary or derivative in a case where the object of the conspiracy was to cause damage to the person injured. It may be that in such case the non-acting conspirators would be considered guilty of independent negligence as commanding or advising the commission of the tort which caused the injury, and to that extent would be liable as if they had committed the act with their own hands." 338 P.2d at 850.

The situation in our case is factually different from *Barsh*. As will be discussed, the jury clearly found InTrust, through its misrepresentations, played an active and not a passive role in the transaction. InTrust cannot insulate itself from the ultimate effect of its misrepresentation by asserting it was merely a passive player. See *Taylor v. Gilmartin*, 686 F.2d 1346, 1361 (10th Cir. 1982), *cert. denied* 459 U.S. 1147 (1983).

In 3 Am. Jur. 2d, Agency § 280, p. 782, the authors note: "A principal may, of course, be liable to a third person for his own tortious conduct, independent of agency principles." The footnote to this statement provides: "See Restatement, Agency 2d § 212 (liability of principal for the consequences of another's conduct which results from his directions where he intends the conduct or its consequences), . . . and Comments thereto stating that rules are not dependent upon the law of agency."

These authorities suggest that although all participants in a conspiracy may be held vicariously liable for acts injuring others committed while in furtherance of a conspiracy, all participants should be considered directly liable for injuries to others which are the objects of the conspiracy, regardless of whether the participants were active or passive conspirators. This argument is supported by *State ex rel. Mays v. Ridenhour*, 248 Kan. 919, 926, 811 P.2d 1220 (1991), where passive defendants were held liable under K.S.A. 17-1255 for knowingly joining in an unlawful venture and committing overt acts in furtherance of the conspiracy. This result is

also supported by the principle that one who instructs another to perform a wrongful act should be no less liable than one who directly commits the act.

It is clear the type of vicarious liability mentioned under principles of conspiracy and aiding and abetting as described in *Ridenhour* is not the same as that described in the respondeat superior cases like *Atkinson*. The difference lies in the fact that in the former, the participants are treated as actual joint tortfeasors, while in the latter, the parties are merely described as jointly liable for the injury such that the principal maintains the right to recover from the servant or agent if forced to satisfy a judgment. Those who conspire to commit a tortious act or who aid and abet the commission of a tortious act do not appear to have this right. 18 Am. Jur. 2d, Contribution § 41, p. 49 provides:

"But the general rule is that there is no right of contribution in favor of any tortfeasor who has intentionally caused or contributed to the injury or wrongful death out of which liability has arisen. Thus, it has been said that as between conscious, willful, malicious, or intentional joint wrongdoers or tortfeasors who are in pari delicto, neither the law nor equity will enforce contribution."

This analysis suggests it should not matter whether InTrust actively or passively participated in the conspiracy or aided and abetted others if injury to the Yorks or other purchasers was the object of the conspiracy or the aiding and abetting. In such a case, InTrust is liable for the wrongful acts leading to the Yorks' injuries.

Here, the jury clearly found InTrust guilty of both engaging in a conspiracy and aiding and abetting others in order to defraud the Yorks. It is apparent that the object of the conspiracy and the aiding and abetting was to injure purchasers like the Yorks in order to obtain a financial benefit for the participants. We will find in this opinion that substantial competent evidence supports the jury's findings, which requires us to hold that InTrust may not be released from liability merely because other defendants obtained a covenant not to sue. This is because InTrust is not merely being held vicariously liable for the tortious conduct of another through no fault of its own. Rather, InTrust itself engaged in tortious conduct by violating the KCPA and by aiding and abetting others and

participating in a conspiracy whose object was to commit a wrongful injury upon the Yorks.

Even if InTrust's argument were correct and the determination of this issue rested upon whether InTrust actively or passively participated in the wrongful act which injured the Yorks, we would then be required to decide whether the evidence proves InTrust was only a passive participant. In making this examination, we view the evidence in the light most favorable to the Yorks, the party who prevailed below. See *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 361-62, 837 P.2d 330 (1992).

InTrust asserts its argument that the evidence indicates it played no active role in causing the Yorks' damages is bolstered by the fact the jury did not find that it fraudulently induced the Yorks to purchase the lot. InTrust concludes: "Clearly, the jury found that any fraud in connection with the sale of the lot was committed by the other defendants, not InTrust."

These statements, however, do not properly reflect the verdict of the jury. In order to find InTrust guilty of a violation of the KCPA, the jury had to conclude that InTrust engaged in a willful misrepresentation of a material fact. In order to award punitive damages, the jury had to find by clear and convincing evidence that InTrust acted in a willful or fraudulent manner. Simply because the jury did not find InTrust fraudulently induced the Yorks to purchase their lot does not mean that InTrust engaged in no misrepresentations in connection with the sale of the lot. These findings are supported by substantial competent evidence and clearly indicate that InTrust actively participated in causing the Yorks' injuries, rather than passively allowing others to injure them. InTrust was found to be an active tortfeasor by substantial competent evidence and was not released from liability by the covenant not to sue granted under the terms of the Yorks' settlement with Delmar and Russell.

*Was liability properly imposed on InTrust for violations of the KCPA?*

While we will also find that liability was properly premised on other grounds, the jury's verdict is separately sustainable because

InTrust was a "supplier" under the KCPA and substantial competent evidence showed it committed deceptive acts and practices pursuant to K.S.A. 50-626(b)(2) and (3).

The trial court ruled that in this transaction, InTrust was a "supplier" within the meaning of the KCPA and subject to liability. This determination involves the interpretation of a statute, which is a question of law over which we have unlimited review. See *In re Tax Appeal of Boeing Co.*, 261 Kan. 508, Syl. ¶ 1, 930 P.2d 1366 (1997). However, we apply the substantial competent evidence test to decide if the factual findings support the legal conclusions. See *Ruebke*, 259 Kan. at 611.

*Was InTrust a "supplier" under the KCPA?*

InTrust argues it is not a supplier under the KCPA because its ordinary business is banking, not selling real estate, and this was the first time InTrust had attempted to develop and sell lots in a subdivision. InTrust relies upon *Moore v. Florida Bank of Commerce*, 654 F. Supp. 38 (S.D. Ohio 1986), *aff'd* 833 F.2d 1013 (6th Cir. 1987) (holding a bank which repossessed two automobiles sold to charity was not engaged in continuous or regular activity and therefore not a "supplier" under Ohio's consumer code).

A supplier under the KCPA is defined by K.S.A. 50-624(i) as "a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer?"

In the present case there was evidence that in the ordinary course of InTrust's banking business, it seized collateral on loans it had made. In order to comply with banking regulations, InTrust is required to dispose of seized property. Thus, the selling of real property obtained through the taking of collateral is deemed to be in the ordinary course of a banking business.

Furthermore, InTrust's argument that this was an isolated transaction might have had some validity had it simply sold the entire Lakeside Estates property in one transaction, rather than attempting to subdivide and develop the property and sell 57 individual lots or homes over a period of 5 or 6 years. Clearly, the sales of

these properties were not isolated transactions, as was the case in *Moore* where only two cars were sold.

Although not precisely on point, a real estate seller was deemed to be a "supplier" and subject to the provisions of the KCPA in *Hoffman v. Haug*, 242 Kan. 867, 752 P.2d 124 (1988), and also in *Heller v. Martin*, 14 Kan. App. 2d 48, 782 P.2d 1241 (1989). In *Hoffman*, this court found no violation of the KCPA because there was no evidence of a deceptive act or practice. However, our opinion defined a " 'consumer' " and a " 'supplier' " and stated: "Hoffman [the buyer] fits the definition of a consumer under the Act, and Haug [a real estate agent] of a supplier." 242 Kan. at 872-73.

*Heller* was a "wet basement" case, and the result is not critical to our analysis. However, the seller of the house (Martin) was deemed to be a supplier and the purchaser (Heller) was considered a consumer. In describing the transaction, Judge Rees stated:

"Was Martin a supplier as defined by K.S.A. 50-624(i)? We conclude that she was.

"Although not a real estate trader or dealer, that is, a person engaged in the buying and selling of real estate for her own account, as a licensed real estate salesperson Martin solicited consumers to enter into real estate sales transactions. She engaged in that activity in the ordinary course of her business. She met the KCPA definition of supplier." 14 Kan. App. 2d at 51.

Martin was held to be a supplier notwithstanding the fact that the residence she was selling was her own. It was considered critical that the property was listed for sale, and the opinion stated "[t]hat an owner's sale of his or her residence most often is an isolated sale also is immaterial here." 14 Kan. App. 2d at 51.

The significant fact in the present case is that Intrust sold or intended to sell numerous lots over an extended period of time, which clearly makes InTrust a "supplier" as defined by the KCPA.

*Does substantial competent evidence show InTrust violated the KCPA?*

In considering InTrust's claim that there was insufficient evidence to support the jury's finding that it committed a deceptive act, we begin with our standard of review:

"When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, it is not the function of this court to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal. [Citation omitted.]" *Cerretti*, 251 Kan. at 361-62.

The KCPA prohibits suppliers from engaging in any deceptive acts or practices in connection with a consumer transaction. See K.S.A. 50-626(a). Under K.S.A. 50-626(b)(2), a deceptive act is defined to include "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact," regardless of whether any consumer has in fact been misled. The court here properly instructed the jury regarding this claim and defined a material fact as "one to which a reasonable person would attach importance in determining his or her choice of action in the transaction involved."

InTrust does not appear to recognize that the purchase contract erroneously stated InTrust would pay a real estate commission to Delmar based on the lot price when in fact it would not do so. InTrust further fails to acknowledge the ultimate commission was hidden in the construction price of the home to be built and represented many multiples of the 6% which the Yorks expected InTrust to pay on the sale of a lot. This clearly constitutes a misrepresentation, although all the Yorks were required to prove was that InTrust engaged in "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact." K.S.A. 50-626(b)(2).

Unable to successfully assert it made no misrepresentation, InTrust next argues this misrepresentation was not material. A material matter was described in *Griffith v. Byers Construction Co.*, 212 Kan. 65, 73, 510 P.2d 198 (1973), as a matter "to which a reasonable man would attach importance in determining his choice of action in the transaction in question." It is clear from the evidence that the Yorks attached great significance and importance to the cost of a home to be constructed on the lot they were purchasing. Having a $16,860 commission tacked onto the construction cost of a home is the equivalent of charging the Yorks a 55%

commission on the lot purchase and having it added to the lot's cost.

InTrust claims that whether a purchaser would indirectly pay a commission on the cost of building a home rather than on the cost of the lot was not material to the Yorks' decision to purchase the lot from InTrust. Again, this contention directly conflicts with Richard York's clear declaration that he would not have proceeded with the transaction had he known that the commission was not being paid by InTrust upon the sale of the lot, but that it would be based upon the cost of the build job and included in the cost of building their home. InTrust's point not only has no merit, it highlights the devastating effect this hidden cost had on the Yorks.

InTrust next asserts that no reasonable person would attach significance to the misrepresentation because such a person would not have concluded that payment by InTrust of a commission upon the sale of the lot meant that the builder would not also owe a commission to the realtor. Richard York, however, testified that it was his belief that a realtor would be entitled to a commission based upon what the realtor sold. The Yorks did not believe a realtor played any part in the construction of a custom home. This is not an unreasonable assumption. Any reasonable person would expect to be informed when purchasing a lot if there were an additional requirement for paying an extra commission of 6% on the cost of building a several hundred thousand dollar home on the lot. This results in an exorbitant and unconscionable fee which the participants attempted to hide from the Yorks.

Next, InTrust argues there is no evidence it willfully violated the KCPA and presents the definition of a willful act given to the jury in conjunction with the instruction regarding punitive damages. There is no requirement, however, that InTrust willfully violate the KCPA in order to find a violation of the KCPA. Rather, the question under K.S.A. 50-626 is simply whether InTrust engaged in the willful use, in any oral or written representation, of a falsehood as to any material fact. The willful use of a misrepresentation is not the equivalent of willfully violating the KCPA, and the definition of willful act argued here is simply not applicable.

InTrust goes on to argue that the KCPA does not proscribe mere nondisclosure, but rather the intentional failure to state or concealment of a material fact. This argument also is not applicable to this case because the deceptive act alleged by the Yorks is a misrepresentation of a material fact, not mere concealment of a material fact. This determination also disposes of InTrust's reliance upon *Hoffman*, 242 Kan. 867, for the proposition that plaintiffs may not recover under the KCPA for the failure to disclose information the plaintiff could have easily discovered. InTrust cites no authority that the same rule should be applied to an actual misrepresentation, nor does the evidence establish that the Yorks could have easily discovered the commission arrangements.

Testing the evidence in the manner in which we are required to do so on appeal, we hold there was substantial competent evidence for the jury to find, as it did, that Intrust violated the KCPA. These findings and rulings are sufficient to justify the award of damages under K.S.A. 50-634(b) and attorney fees pursuant to K.S.A. 50-634(e) to the Yorks. However, before we consider those issues, we return briefly to InTrust's argument that insufficient evidence existed to justify the jury's verdict that it conspired with or aided and abetted any other party in defrauding the Yorks.

*Was there substantial competent evidence InTrust conspired with or aided and abetted other parties to cause damage to the Yorks?*

While the jury's verdict was properly entered as to the KCPA violation, it can also be sustained based on its findings that InTrust conspired with or aided or abetted other parties to cause damage to the Yorks. On review, we are not to disturb the verdict if the evidence, with all reasonable inferences to be drawn therefrom and considered in the light most favorable to the Yorks, supports the verdict. See *Cerretti*, 251 Kan. at 361-62. We hold that it does.

InTrust begins by pointing to the incongruity that even though the jury found it had made no fraudulent representation to the Yorks, the jury went on to find InTrust had conspired with others to defraud them. This, however, is not what the jury found. First, the jury found that InTrust did not fraudulently induce the Yorks to purchase the lot, not that InTrust made no fraudulent repre-

sentations. Second, the fraud claim the Yorks alleged against InTrust required clear and convincing proof, unlike the other counts requiring proof by a preponderance of the evidence. Simply because the jury ruled in favor of InTrust upon the fraud count, which required a higher burden of proof, does not mean the evidence was insufficient that InTrust engaged in a conspiracy or aided and abetted others to defraud the Yorks. Further, in finding InTrust had violated the KCPA, the jury found InTrust had committed a deceptive act or practice by the willful use of any oral or written representation of exaggeration, falsehood, innuendo, or ambiguity as to a material fact. In finding that punitive damages should be awarded, the jury also found by clear and convincing evidence that InTrust had acted in a willful or fraudulent manner.

*Conspiracy*

As to the conspiracy claim, InTrust disputes most of the required elements. The five elements necessary for a conspiracy to exist are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages proximately caused by those acts. *Ridenhour*, 248 Kan. at 927.

*Two or more persons*

First, InTrust asserts it could not conspire with Delmar and Russell because they were its agents, citing *May v. Santa Fe Trail Transportation Co.*, 189 Kan. 419, 424, 370 P.2d 390 (1962). Although it is true that agents or employees acting only in their official capacities on behalf of a corporate defendant and whose acts are considered those of the corporation may not form a conspiracy with the corporation, such is not the case here.

Delmar and Russell are clearly separate entities with contractual relationships with each other and with InTrust. In pursuing the conspiracy at issue, they were not acting in any capacity as officials of InTrust so that their activities could be deemed acts of InTrust. Russell was an independent contractor who contracted to help with the development of Lakeside Estates. Russell then retained Delmar, who was a licensed realtor subject to the Real Estate Brokers'

and Salespersons' License Act, K.S.A. 58-3034 *et seq.*, to help sell the subdivided property .

Cases where only employees of a corporation are involved are not applicable here because InTrust conspired with third parties (outsiders), people acting with their own individual interests involved. There is no reason why these parties could not conspire with InTrust, or InTrust with them. This point has no merit.

## Object to be accomplished

InTrust claims the Yorks attempted to establish that the object of the conspiracy was to conceal the commission to be paid on the build-job transaction. InTrust argues this object was not accomplished because the commission was revealed and InTrust would have had no reason to pursue such an object because it had no value to InTrust.

The Yorks respond by pointing out that the evidence established that the object of the conspiracy was to facilitate a sale of a lot at the best possible price while concealing the fact that the purchaser would be forced to pay a commission based not on the cost of the lot but on the cost of a home built on the property. Intrust officer Eastwood admitted that InTrust's goal was to get the best price possible for a lot and that InTrust had no intention of paying any real estate commission beyond the 15% development fee it was paying Russell. Further, it may be implied that the parties attempted to conceal the commission arrangement by misrepresenting it on the purchase contract and by including a confidentiality clause in the builder's agreements, regardless of the fact that one of the builders eventually breached this clause. Contrary to InTrust's claim that it had no interest in the arrangement, the evidence indicates that Russell would have demanded a larger fee if he had been required to pay the real estate commission, which would have reduced InTrust's return on the sale of the lots.

## Meeting of minds

InTrust alleges there is no proof of a meeting of the minds to conceal the commission arrangement. InTrust then argues there is nothing to establish it acted knowingly to further the tortious pur-

pose of the other defendants. InTrust claims that it merely signed a purchase contract prepared by its agent that was technically inaccurate.

The Yorks properly respond that in proving this element of conspiracy, they are not required to prove an actual agreement. Rather, circumstantial evidence of the agreement is universally recognized as the proper means of proving a conspiracy. *Nardyz v. Fulton Fire Ins. Co.,* 151 Kan. 907, 911, 101 P.2d 1045 (1940). Thus, a conspiracy may be proven by either showing the conspiracy itself or by showing the separate acts of the conspirators involving the same purpose or object.

There is sufficient evidence to establish InTrust knew of and had discussed or negotiated the commission arrangement with Russell. Furthermore, it was Delmar, specifically acting on InTrust's behalf, who presented the lot purchase contract containing the misrepresentation regarding the commission arrangement. There is evidence InTrust was aware of this misrepresentation and discussed it with Delmar. Furthermore, InTrust took no steps to correct this misrepresentation or instruct its agent to do so, the builder's agreements contained a confidentiality clause, and no one informed the Yorks of the commission to be paid on the build job. These facts constitute circumstantial evidence of the existence of a conspiracy to conceal the commission arrangement. Substantial evidence supports the jury's finding that there was a meeting of the minds and that InTrust knowingly acted to further the conspiracy.

*One or more unlawful overt acts*

InTrust next argues there is insufficient evidence to prove the fourth element of the conspiracy claim, that an unlawful or overt act was committed by one or more of the conspirators. The Yorks alleged the overt act committed was fraud by silence in concealing the build-job commission. Instruction No. 11 told the jury five elements must be proven to establish fraud by silence: (1) other entities or persons had knowledge of material facts which the plaintiffs did not have or could not reasonably have discovered; (2) the other entities or persons failed to communicate the material facts, and (3) this was done intentionally; (4) the plaintiffs justifiably re-

lied upon the others to communicate the material facts; and (5) the plaintiffs sustained damages as a result of the failure to communicate the material facts.

Regarding the unlawful act, InTrust claims fraud by silence must be proven by clear and convincing evidence, but provides no citation to support the argument that when fraud by silence is another element of a claim that merely requires proof by a preponderance of the evidence that it is more likely true than not, it still requires the higher burden of proof. This question is not well answered by the Yorks, but we find the evidence of fraud by silence was substantial and was of a clear and convincing quality, which is sufficient to support the jury's finding here. See *Newell v. Krause*, 239 Kan. 550, 557, 722 P.2d 530 (1986).

*Damages proximately caused*

InTrust asserts there is no evidence that the commission on the build job was material to the Yorks' decision to purchase lot. This is contrary to Richard York's clear testimony that had he known he would have to pay a commission on a build job, he would have purchased elsewhere. The fact the Yorks purchased the lot prior to receiving bids on the cost of building their home does not mean that they were willing to pay any price for a home or that they were willing to pay a 6% commission on that cost.

Next, InTrust claims the Yorks could have discovered the arrangement because the purchase contract mentioned the builder's agreement. This argument ignores the fact that the language of the purchase contract specifically refers to a builder's agreement between the parties to the purchase contract. Russell and the exclusive builders, who were parties to the builder's agreements at issue, were not parties to the purchase contract. Thus, the builder's agreements between Russell and the builders which referred to the commission due Delmar was not incorporated into the purchase contract. Furthermore, the builder's agreements contained a confidentiality clause, and the jury was entitled to disbelieve Russell's explanation that the clause was inadvertently, rather than deliberately, included in the builder's agreements.

InTrust goes on to argue that there was no failure to disclose the commission arrangements because Zimbleman itemized the commission in his bid to build the Yorks' home. This argument is clearly irrelevant, as it matters little that the Yorks inadvertently discovered the information after they had already purchased their lot. The point is that this information should have been disclosed prior to the purchase.

Finally, InTrust asserts that the Yorks did not justifiably rely on the alleged nondisclosure of the commission arrangements because they failed to heed the warning signals and ask for further information. InTrust points out that the Yorks believed a commission would be paid on speculative or model homes and that they assumed without asking that no commission would be paid on custom homes.

The evidence in this case, viewed in the light most favorable to the Yorks, indicates they believed a commission is normally only paid on what is sold, which explains the difference in their minds between a speculative or model home and a custom home. The evidence elicited on cross-examination, that Richard York may have been aware at the time of the lot purchase that some areas added a build-job commission on custom homes, does not undermine the clear evidence that York was relying upon his rights as he believed them to be expressed in the lot purchase contract, which indicated InTrust would be paying the commission. The language of the purchase contract clearly explains and justifies the Yorks' reliance upon their belief that they were obligated to pay no further commissions.

There was substantial competent evidence to sustain the jury's finding on the conspiracy count.

*Aiding and abetting*

In order to find InTrust liable for aiding and abetting others to defraud the Yorks, the jury was required to find the following elements: (1) The party whom the defendant aids must perform a wrongful act causing injury; (2) at the time the defendant provides assistance, he or she must be generally aware of his or her role in part of an overall tortious or illegal activity; and (3) the defendant

must knowingly and substantially assist in the principal violation. *Ridenhour,* 248 Kan. at 936.

InTrust first makes the general argument that there was no evidence that any defendant committed fraud by silence or injured the Yorks by any wrongful act. This argument has been previously addressed and need not be repeated here.

Second, InTrust disputes whether it was aware of its role as part of a tortious activity. It asserts the only evidence presented of this element was that InTrust executed the purchase contract containing "a boilerplate Agency Disclosure Notice" indicating it was paying the commission. InTrust ignores, however, evidence that it was aware, through both a memorandum from and conversations with Russell, of the commission arrangement. There also was evidence that InTrust knew the purchase contract did not reflect the true commission arrangement and that it took no action to ensure that purchasers of the lots it sold were aware they would be forced to indirectly pay a commission, not on the price of the lot they were purchasing, but on the cost of building their home. Furthermore, there is evidence InTrust continued to fail to disclose this information to other purchasers after receiving the Yorks' complaint that it was materially misrepresenting the facts regarding the property.

Third, InTrust claims it did not knowingly or substantially assist in the wrongful conduct. It asserts it encouraged no wrongful act and engaged in no conduct designed to prevent discovery of the truth. InTrust points out it was not a parties to the build-job transaction and that it was not aware of the contents of the builder's agreements.

InTrust's arguments regarding these elements also fail. There was evidence InTrust sanctioned a misrepresentation of a material fact pertaining to the sale of the lot and failed to inform purchasers of the true commission arrangement. Further, despite the fact that InTrust was not a signing party of the builder's agreement, the only authority Russell had to enter into such an agreement was due to his acting on InTrust's behalf in developing the Lakeside Estates property and because the build-job transactions were a necessary part of InTrust's plan of developing Lakeside Estates to realize the

most profit from the sale of the property. InTrust will not be permitted to claim willful ignorance of a contract entered into by Russell on InTrust's behalf. In addition, the jury was entitled to disbelieve that InTrust was not aware of these provisions.

We said in *Ridenhour* that "[a] qualitative difference exists between proving an agreement to participate in a tortious line of conduct and proving knowing action that substantially aids tortious conduct. In some cases, an agreement cannot reasonably be inferred from substantial assistance or encouragement." 248 Kan. at 937. The jury in the present case was instructed regarding six factors to be used to determine whether InTrust knowingly provided substantial aid: (1) the nature of the act encouraged by InTrust; (2) the amount of InTrust's assistance; (3) InTrust's presence or absence at the time of the tortious act; (4) InTrust's relation to the other parties; (5) InTrust's state of mind; and (6) the duration of InTrust's assistance.

In applying these factors to the facts of this case, we first consider the nature of the act encouraged. This act was to conceal the commission on the build-job transaction until after the purchasers of the lots would be obligated to pay it. Perhaps a different way of saying the same thing is to say it was a part of a deliberate scheme to inflate commissions and mislead purchasers. Failing to reveal material information InTrust possessed and allowing a known misrepresentation to be conveyed to purchasers are the essence of InTrust's wrongful conduct.

Next, we must consider the amount of assistance. This is difficult to judge in this case because the essence of the wrongful act is a failure to take action to reveal the commission arrangement. Thus, doing nothing would be of great assistance to the principal actors in the tortious conduct. However, InTrust also participated in the concealment by permitting a misstatement it was aware of to be included in the purchase contract it signed. In light of the fact that only a small action on InTrust's part would have revealed the material facts so that the Yorks would not have been injured, this factor should weigh heavily against InTrust.

The third factor, presence, is also problematic because the wrongful act here involves a course of conduct resulting in the

concealment. All parties participating in the concealment, including InTrust through the inaccurate purchase contract it signed, are deemed to have been present at the act.

The fact that the principal actors in the tortious conduct were acting as InTrust's contractual partners in developing InTrust's property interest at Lakeside Estates when they devised the commission arrangement and proceeded to conceal it from purchasers is particularly harmful to InTrust's position. These were not totally independent parties over which InTrust possessed no authority or as to which it had no reason to be aware of their activities.

Next, we found a rapacious state of mind to weigh heavily against the defendants in *Ridenhour*, 248 Kan. at 941. This motive is equally applicable here, as the commission arrangement arrived at prevented InTrust from paying a commission or from paying Russell a greater development fee and ensured that InTrust kept more proceeds from the sale of the lots. Further, the arrangement contributed towards more sales, as purchasers of lots believed a real estate commission would be limited to the cost of the lot (as it should have been).

Finally, the duration of the assistance here also does not weigh in InTrust's favor. It persisted over an extended period of time, even after InTrust received complaints about its participation in the arrangement.

All of the factors weigh against InTrust, and some weigh heavily. They require our conclusion that InTrust knowingly and substantially assisted and participated in the maximizing of its return and in hiding an obligation to be imposed by parties in its contractual circle upon unsuspecting purchasers like the Yorks. There is clearly evidence to support the jury's finding that InTrust aided and abetted other parties to cause damage to the Yorks.

We have approved three different reasons to sustain a judgment in the Yorks' favor and against InTrust for consequential damages and attorney fees. Further, what we have said predicts our approval of the jury's decision that punitive damages should be awarded.

However, before we reach all of the damage questions, we must decide the threshold issue of whether to consider only those ar-

guments raised by InTrust's appeal or also those raised by the Yorks' cross-appeal. The precise question is:

*Are the Yorks precluded from cross-appealing because they accepted the trial court's ordered remittitur prior to InTrust's filing a notice of appeal?*

This issue presents us with a question of law over which our review is unlimited. *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1992).

InTrust seeks enforcement of the rule that a party who has accepted a remittitur has acquiesced in the judgment and thereby forfeits the right to appeal that judgment. See *Iseman v. Kansas Gas & Electric Co.*, 222 Kan. 644, 652, 567 P.2d 856 (1977).

The Yorks question *Iseman*'s authority based on our later decision of *Garden City Country Club v. Commercial Turf Irrig., Inc.*, 230 Kan. 272, 634 P.2d 1067 (1981). They also point to the modern and more equitable trend that allows a plaintiff to cross-appeal a remittitur once a defendant declines to accept the benefit granted by the trial court and appeals as if a remittitur had never been requested or granted.

A remittitur is defined as the "procedural process by which an excessive verdict of the jury is reduced." Black's Law Dictionary 1295 (6th ed. 1990). See *Tuley v. City of Kansas City*, 17 Kan. App. 2d 661, 666-69, 843 P.2d 267, *rev. denied* 252 Kan. 1094 (1993).

In commenting on the practice of granting a remittitur when the trial court deems the damage award excessive, 22 Am. Jur. 2d, Damages § 1021 states: "In most jurisdictions the trial court, as a condition of entering judgment upon the verdict . . . may require a remittitur of the excess from the judgment entered or the verdict returned and enter . . . judgment for the amount so reduced."

With a remittitur, we have, in effect, a post-trial settlement negotiation where the court utilizes its discretion to reduce what it believes to be an excessive judgment to one which it believes both parties should accept. This is exactly what happened here. InTrust was not satisfied with the result achieved and has appealed, although InTrust now wishes to prevent the Yorks from cross-ap-

pealing, due to the fact they accepted the trial court's remittitur ruling.

In reviewing our recent Kansas authority, we begin with *Hawkins v. Wilson*, 174 Kan. 602, Syl., 257 P.2d 1110 (1953), where an appeal by a defendant was dismissed because "he invited and gave implied consent to the trial court's action in reducing the verdict." The defendant had requested a new trial or a reduction of the verdict. The request was granted and accepted by the plaintiff. This was deemed to be in effect invited error or acquiescence in the judgment, and the defendant's right to appeal was cut off. If this were still the Kansas rule, InTrust's appeal would have to be dismissed.

An identical decision 11 years later, *Anstaett v. Christesen*, 192 Kan. 572, 389 P.2d 773 (1964), was decided almost summarily, following *Hawkins*.

Next in our chronology is *Iseman*, 222 Kan. 644. This is the primary authority relied on by InTrust, as *Iseman* precluded a cross-appeal by a plaintiff from a trial court's order granting a remittitur or, in the alternative, a new trial on the grounds of acquiescence and the authority of *Hawkins*. Such is understandable given the state of our law at the time, but it is difficult to fathom why the KG&E appeal was even considered, as it was in the identical position which had been deemed fatal to attempted appeals by the defendants in *Hawkins* and *Anstaett*.

In any event, we began to step away from our earlier decisions in this area in *Garden City Country Club*, 230 Kan. 272, Syl. ¶ 1, where we said:

> "Where a verdict is reduced and judgment entered for the residue on motion of the party against whom the verdict was entered, said party has neither consented to nor acquiesced in the new judgment, and is not barred from appeal. The holdings of *Anstaett v. Christesen*, 192 Kan. 572, 389 P.2d 773 (1964), and *Hawkins v. Wilson*, 174 Kan. 602, 257 P.2d 1110 (1953), so far as they are contrary to or inconsistent with this opinion, are expressly rejected and overruled."

In *Garden City*, a verdict rendered for the defendant on its counterclaim was reduced when plaintiff requested a remittitur, which was granted. When the plaintiff appealed, the defendant utilized *Anstaett* and *Hawkins* to argue the granting of the remit-

titur barred the appeal. In analyzing the propriety of rejecting the appeal, Justice McFarland wrote:

"Under the *Anstaett-Hawkins* rule a party requesting a remittitur throws himself on the mercy of the trial court and if he receives a remittitur in any amount he is deemed to have consented to the judgment and to be legally satisfied with the entire proceedings and precluded from appeal. We also note the *Anstaett-Hawkins* rule appears to be inconsistent with the current legal philosophy of simplifying appeals and making them readily available to litigants. A cursory review of legal encyclopedias and the law of other jurisdictions reveals no comparable rule, nor has any been cited by the parties. The *Anstaett-Hawkins* rule appears to be a maverick in our Kansas law and should be summarily cast out." 230 Kan. at 275.

The Yorks argue the authority of *Iseman* is diminished by the overturning of *Anstaett-Hawkins* decisions by *Garden City*. InTrust points out that *Iseman* was not mentioned in *Garden City* and that *Iseman* was reaffirmed in *Folks v. Kansas Power & Light Co.*, 243 Kan. 57, 77, 755 P.2d 1319 (1988), where we said: "[A] party that accepts a remittitur is precluded from appealing, the reduction of the award."

InTrust cites older cases from a minority of jurisdictions, including Florida, Mississippi, Nevada, Ohio, Pennsylvania, and Virginia, which prohibit a plaintiff who accepted a remittitur from cross-appealing even though the defendant has appealed.

The Yorks argue that the more modern and more equitable rule allows a cross-appeal by a party who has previously accepted a remittitur once its adversary abandons the benefits received by the remittitur and files a notice of appeal of the judgment entered. Approximately 20 jurisdictions have expressly adopted this rule. The most persuasive of the arguments in its favor is set forth in *Plesko v. Milwaukee*, 19 Wis. 2d 210, 221, 120 N.W.2d 133 (1963):

"The objective underlying the recommended procedure for granting an option to accept judgment for a reduced amount of damages in lieu of having a new trial where the damages awarded by the jury are determined by the trial court to be excessive, is to avoid the delay and expense of an appeal or a new trial. In most situations, it is likely that the party will accept judgment for such reduced damages rather than undergo the expense, delay, and uncertainty of result of an appeal or new trial. Nevertheless, if a party found liable to pay damages appeals the judgment resulting from the other party's accepting such reduced damages, this objective has been negatived. When plaintiff is forced to undergo an appeal by the action of an opposing party, after plaintiff has accepted judgment for such reduced

damages, it seems unfair to prevent his having a review of the trial court's determination leading to the reduction in damages, especially if plaintiff has accepted same only to avoid the delay and expense attending an appeal. Furthermore, the new rule herein announced may to some extent discourage appeals by the party held liable because of the possibility that the party who has accepted judgment for the reduced damages may prevail on his motion for review and have the jury's verdict reinstated."

Although similar views are set forth in numerous other opinions, the rationale for the rule is most succinctly stated in *Burns v. Mc-Graw-Hill Broadcasting Co., Inc.*, 659 P.2d 1351, 1355 (Colo. 1983):

"In our view, cross-appeals of remittiturs should be permitted when the party for whom the remittitur was granted appeals on other grounds. The reasons supporting the traditional rule are not present when the plaintiff is forced into the position of responding to an appeal by the defendant. Judicial economy is best achieved by reviewing the remittitur judgment at the same time other issues in the case are resolved. A new trial may be completely avoided if the trial court's order is found erroneous and the original verdict is reinstated. Moreover, such a rule encourages the defendant to pursue only meritorious appeals because of the chance that the appellate court may reinstate the original verdict while ruling against the appellant on all other issues."

Although some of the states following this new trend do have statutory underpinnings for their rule, most of the states surveyed treat the plaintiff's acceptance of the trial court's reduction of what the court believed to be an excess judgment as no longer having any binding effect once the remittitur "offer" is rejected by the defendant's appeal. For a compilation of the states so holding, see Annot., 16 A.L.R.3d 1327 and the supplement thereto.

It is much more consistent with the path we began in *Garden City* to adopt the majority rule than to leave the playing field unbalanced in the post-verdict arena. We hold that a party accepting a remittitur, while not permitted to appeal from that decision, is free to cross-appeal the remittitur once its adversary abandons the benefits received from a granted remittitur and appeals. To the extent this ruling requires the overruling of contrary statements in *Iseman* and *Folks*, we do so.

*Should the damages be limited to the amount of the build-job commission?*

InTrust first argues that the Yorks' damages should be limited to $16,860, the amount of the commission itemized on Zimbleman's bid to build their home, because the Yorks failed to mitigate their damages by immediately proceeding with construction. The trial court appeared to agree in spirit with InTrust's assertion, but refused to limit the damages as a matter of law because InTrust presented no persuasive authority for the proposition. The court held the issue of mitigation was for the jury's factual determination and when presented with InTrust's argument, refused to adopt it.

InTrust now argues the trial court should have, as a matter of law, utilized the rule that "a party is entitled to recover only his actual damages less those he might have reasonably prevented" to limit the Yorks' recovery to $16,860, relying on *Lines v. City of Topeka*, 223 Kan. 772, 781, 577 P.2d 42 (1978).

The Yorks cite *First Nat'l Bank v. Milford*, 239 Kan. 151, 158-59, 718 P.2d 1291 (1986), and 22 Am. Jur. 2d, Damages § 500 in arguing that InTrust was in as good a position as they were to mitigate the damages and failed to do so. 22 Am. Jur. 2d, Damages § 498, p. 582 states: "The doctrine of avoidable consequences is simply one of good faith and fair dealing. The injured person need not make extraordinary efforts or do what is unreasonable or impracticable in his efforts to minimize damages."

The jury in this case was properly instructed that the amount of damages should not include "loss which plaintiffs could have prevented by reasonable care and diligence exercised by them after the alleged wrongful conduct occurred." The jury, in awarding the damage amounts, implicitly found against InTrust's argument that the Yorks could have prevented their damages by simply paying the commission. Substantial evidence supports the jury's conclusion that the Yorks acted reasonably. We will not find as a matter of law that the damages are limited to the amount of the commission.

We also agree with the jury's determination. There is evidence the Yorks acted in good faith and engaged in fair dealing. Twice they made offers to the defendants which would have substantially mitigated their damages. First, the Yorks offered to release their claims against InTrust if it simply rescinded the purchase contract.

Thus, in this instance, InTrust was in the best position to avoid incurring substantial damages, but it refused to do so. Next, the Yorks offered to place the disputed amount of the commission in escrow pending the results of the litigation so that they could proceed with building their home and avoid further damages. Again, this offer was never accepted. The evidence supports a finding that the Yorks acted reasonably to attempt to avoid their damages, but were prevented from doing so by the acts of the defendants.

Nor does reason require the Yorks to pay the disputed amount of the commission in order to avoid their damages. Once paid, this money may not have been recoverable even if the Yorks did prevail on their claim. $16,860 is a substantial sum of money and is hardly a trifling amount in comparison with the amount of damages eventually sustained by the Yorks.

We hold the Yorks were within their rights to withhold payment under the facts of this case. There is substantial evidence to show they acted reasonably. The damages are not, as a matter of law, limited to the amount of the build-job commission.

*Was there substantial competent evidence to justify a punitive damage award?*

InTrust first claims the affidavit in support of the Yorks' claim for punitive damages was insufficient. When the motion to amend under K.S.A. 60-3703 was argued, this objection was not made, nor was it made at the time the trial court instructed the jury on the punitive damages claim. As such, this argument is on an issue not presented to the trial court which may not be raised for the first time on appeal. See *Ripley v. Tolbert*, 260 Kan. 491, Syl. ¶ 6, 921 P.2d 1210 (1996). Furthermore, even if considered, the issue would be without merit because the underlying information to substantiate the Yorks' punitive damage request had been presented to the trial court. Thus, we move on to consider whether the evidence supports the jury's finding.

Our standard of review of this issue is the same as any other issue where the evidence is alleged to be insufficient, except that we must find that the substantial evidence supporting the punitive

damages finding is clear and convincing. See *Cerretti*, 251 Kan. at 369-70.

The jury was instructed in substantially the same manner suggested by PIK Civ. 3d 171.44, that the burden is on the plaintiff to prove by clear and convincing evidence that InTrust acted in a willful or fraudulent manner. Instruction No. 14 specifically stated:

"In no case should you award punitive damages against defendant for the fraudulent conduct of any other party unless you find that defendant InTrust Bank, through a person expressly empowered to do so by defendant, authorized the other party to engage in the fraudulent conduct."

InTrust asserts there was no evidence it had a purpose to inflict harm on anyone simply by executing the purchase contracts or that InTrust authorized any party to defraud or mislead the Yorks. InTrust, however, mischaracterizes its actions and ignores the inferences that may permissibly be drawn from the evidence.

There is evidence that InTrust was aware of the commission arrangement and that such an arrangement would be of benefit to InTrust. There was evidence that InTrust entered into an agreement to conceal this arrangement from lot purchasers and that InTrust assisted in misrepresenting material facts in order to do so. Such a purpose is a wrongful act designed to injure purchasers in order to further InTrust's financial interests.

There exists substantial competent evidence of a clear and convincing nature sufficient to support the jury's decision to award punitive damages.

*Did the trial court abuse its discretion in the award of attorney fees to the Yorks?*

"The reasonable value of attorney fees rests within the sound discretion of the trial court, and its determination will not be disturbed in the absence of an abuse of discretion." *City of Wichita v. B G Products, Inc.*, 252 Kan. 367, Syl. ¶ 3, 845 P.2d 649 (1993). If the trial court's award of fees is supported by substantial competent evidence, there is no abuse of discretion.

The attorney fees which the trial court allowed in the present case were clearly authorized once InTrust was determined to be a

"supplier" and the jury found it had violated the KCPA. This brings into issue the specific provisions of K.S.A. 50-634(e), which states:

"[T]he court may award to the prevailing party reasonable attorney fees, including those on appeal, limited to the work reasonably performed if:

"(1) . . . a supplier has committed an act or practice that violates this act and the prevailing party is the consumer; and

"(2) an action under this section has been terminated by a judgment, or settled."

Thus, statutory attorney fees constitute a remedy under the KCPA which is in addition to and separate from the allowance of damages under K.S.A. 50-634(b). The trial court allowed the sum of $45,000 plus $1,383.28 in expenses. This is the amount InTrust claims to be unreasonable and excessive, principally because it claims only a minimal part of the Yorks' attorneys' time was spent addressing the KCPA issue.

The Yorks' expert witness on attorney fees testified that the KCPA claim involved a core set of facts shared with the other claims and that he had calculated the amount of attorney fees for work on the KCPA claim in two independent ways. First, he estimated the amount of time he would have expected to have expended to prosecute the KCPA claim. Next, he reviewed the time entry logs to calculate how much time the attorneys for the Yorks spent prosecuting the KCPA claim. The expert calculated a greater number of hours utilizing the former method than the latter. The court's award falls within the range calculated utilizing the second method.

There is substantial evidence to support the trial court's award of attorney fees. It was clearly necessary for all of the underlying facts of the transaction to be fully developed in order to prosecute the KCPA claim. Those services may have also resulted in findings of other tortious conduct sufficient to justify a judgment, but the KCPA claim is inextricably intertwined with the single transaction which is the subject of this litigation.

The trial court did not abuse its discretion in the amount of attorney fees and expenses it awarded under the KCPA.

**Yorks' Cross-appeal**

*Did the trial court err in granting a remittitur?*

Our existing law in Kansas as to the granting of a remittitur was well summarized by Judge (now Justice) Davis in *Tuley v. City of Kansas City*, 17 Kan. App. 2d 661, 666-69, 843 P.2d 267 (1992), *rev. denied* 252 Kan. 1094 (1993). We need not harmonize the decisions discussed in *Tuley* except to note our disapproval of the Yorks' argument that our standard of review is that of whether there was substantial competent evidence to support the jury's verdict. The case the Yorks cite for the argument that the trial court was not entitled to substitute its judgment for that of the jury, *Mettee v. Urban Renewal Agency*, 219 Kan. 165, 169, 547 P.2d 356 (1976), was a condemnation action where the verdict was clearly within the evidence that was properly admitted and in which we refused to allow the trial court to adopt a value in the middle of the expressed opinions when the jury had selected a value nearer to the highest opinion.

Our standard of review over whether the trial court erred in granting a remittitur is one of abuse of discretion.

Although InTrust makes a complicated, but plausible, argument in support of the reduction, InTrust primarily continues its previously stated position that increased interest expense should never have been an element of damages in the first place. This is a contention the trial court did not embrace, nor do we on appeal.

The Yorks soundly argue, however, that it was erroneous for the trial court to compute a lump-sum amount of damages in the form of excess interest could be applied at the beginning of the loan to reduce the amount of increased interest expense when payments had already been made for 14 months at the time the damages reduction was computed. By the time of this opinion, an entirely different amount will be required to compensate the Yorks for the additional interest they will have been forced to pay because of Intrust's actions.

We hold it was not an abuse of discretion for the trial court to order a remittitur or, in the alternative, a new trial on the issue of interest damages, but the lump-sum amount was inaccurately computed as being capable of being applied at the time of the commencement of the loan to reduce interest expense.

We approve generally the methodology of the trial court as set forth in its journal entry of judgment dated December 11, 1995, of comparing a 30-year, 8.25% variable rate mortgage loan of $203,150 to a $203,500 loan at 6% for 15 years. The trial court, in determining the amount of the remittitur to be ordered, should compute the amount which, when applied to the indebtedness, would require the Yorks to pay the same amount of interest as they would have paid under the terms of the original 15-year loan. If the parties do not agree with the amount established by the trial court as we have directed, it should order a new trial limited to the single issue of the amount of interest damages.

This entire analysis approves of the balance of the $17,300 damages awarded by the jury. That amount was properly computed and assessed. In addition, it was not an issue on appeal and need not be subject to further proceedings except to be included in the judgment awarded to the Yorks prior to granting InTrust any credits.

*Should InTrust receive credit for the settlement amounts paid to the Yorks?*

The Yorks raise several arguments addressing the propriety of the credit granted to InTrust, including: (1) Should InTrust be precluded from receiving credit for the settlement amounts paid to the Yorks? (2) Did the trial court err in granting InTrust a pro tanto credit for the full amount of the Russell and Delmar settlements? (3) Is InTrust entitled to an additional pro tanto credit for the amounts received by the Yorks' settlement with West? (4) Is InTrust entitled to a credit for the settlements with other defendants against the amount of punitive damages assessed against it? Although raised separately by the Yorks, these issues are all in effect the same and all involve common issues of law. We therefore consider them together.

We begin this discussion by pointing out this is *not* a case involving the comparative negligence (fault) provision of K.S.A. 60-258a. Nowhere in the pleadings is negligence alleged. The case was not tried in a manner that comparative fault could or should have been determined. As such, we do not attempt to apply any of our

rules relating to K.S.A. 60-258a, which were summarized in *Glenn v. Fleming*, 240 Kan. 724, 732 P.2d 750 (1987). K.S.A. 60-258a did not change the common-law rule of joint and several liability for defendants in intentional tort actions. *Sieben v. Sieben*, 231 Kan. 372, 378, 646 P.2d 1036 (1982).

The questions raised by the granting of a pro tanto credit in this case for the $65,000 pretrial settlement and the unknown amount of the post-trial settlement with West involve compensatory damages, punitive damages, and statutorily allowed attorney fees, making these questions of law over which our review is unlimited. See *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1991).

Kansas has not varied from a rule that limits a plaintiff to only one recovery for a wrong. This rule has been applied throughout the years in situations where partial payments have been made by multiple tortfeasors. A pro tanto credit has been granted to prevent a plaintiff from receiving a double recovery. By definition, the word pro tanto means "[f]or so much; for as much as may be; as far as it goes. Partial payment made on a claim." Black's Law Dictionary 1222 (6th ed. 1990).

Although the case of *Meixell v. Kirkpartick*, 29 Kan. 679 (1881), involved judgments in separate trials against two different tortfeasor defendants, the basic tenor of pro tanto operation of payment by one of the tortfeasors was established when Justice Brewer said: "Of course one full payment by either debtor discharges the entire debt, but a compromise with one operates only as satisfaction pro tanto of the claim against the other." 29 Kan. at 684.

*Jacobsen v. Woerner*, 149 Kan. 598, 89 P.2d 24 (1939), was earlier cited herein for the rule that a covenant not to sue one joint tortfeasor does not release other joint tortfeasors. In response to the pro tanto credit issue, the *Jacobsen* opinion also stated:

"Did the court err in not reducing the judgment by the amount paid the plaintiff by the Cardinal Stage Lines Company under the covenant not to sue? We think it did.

"In *Abbott v. City of Senath*, (Mo.) 243 S. W. 641, the court said:

'It is a just and well-established doctrine that there shall be but one satisfaction accorded for the same wrong. If one be injured by a tortious act, he is entitled to compensation for the injuries suffered, and, if several persons are guilty in common of the tort, the injured one has his right of action for damages against each

and all of the joint tort-feasors, and may at his election sue them individually or together. But if he receive full satisfaction from one of them, his right of action against the other is thereby extinguished. (*Dulaney v. Buffum*, 173 Mo. 1, 73 S.W. 125; *Butler v Ashworth*, 110 Cal. 614, 618, 43 Pac. 4, 386.)

' "In such a case it is not necessary that it should appear that the party making the settlement was in fact liable. It will be deemed sufficient if there is an appearance of liability; that is, something in the nature of a claim on the one hand, and a possible liability under the rules of law on the other." (*Cleveland, etc., R. R. Co. v. Hilligoss*, 171 Ind. 417, 425, 86 N.E. 485, 488, 131 Am. St. Rep. 258.)'

. . . .

"When a right of action is once satisfied it ceases to exist. If part satisfaction has already been obtained, further recovery can only be had of a sum sufficient to accomplish satisfaction. It is not necessary that the party making payment in partial satisfaction was in fact liable. Anything received on account of the injury inures to the benefit of all and operates as a payment *pro tanto*. The plaintiff is entitled to only one satisfaction from whatever source it may come." 149 Kan. at 603.

In *Cullen v. Atchison, T. & S. F. Rly Co.*, 211 Kan. 368, 377, 507 P.2d 353 (1973), the principal issues revolved around a settlement where a covenant not to sue was given. Pertaining to the issue herein, we said:

"A covenant not to sue one joint tortfeasor does not release other joint tortfeasors; however, anything received by way of covenant not to sue operates as a payment *pro tanto* upon any judgment obtained against the others. (*Jacobsen v. Woerner*, [149 Kan. 598, 89 P.2d 24 (1939)].) Accordingly, the trial court erred in denying appellant's alternative motion for *pro tanto* credit."

See *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 348, 28 L. Ed. 2d 77, 91 S. Ct. 795 (1971); Prosser & Keeton, The Law of Torts § 49 (5th ed. 1984); Restatement (Second) of Torts § 885(3) (1977).

What we have said thus far answers negatively the contention of the Yorks that InTrust should be precluded from receiving any credit for settlement amounts paid to the Yorks. We decline the Yorks' argument that InTrust has not carried its burden to be entitled to the credits granted, for we adhere to the rule that the Yorks are only entitled to receive that which will make the Yorks whole.

In order for a windfall to be avoided, it is also necessary for an additional pro tanto credit to be awarded for the amounts received

by the Yorks from their settlement with West. We are unaware as to the amount of this settlement, as it was not disclosed in the record, but it is to be established by the trial court on remand and added to the $65,000 credit previously identified as the amount necessary to reduce the judgment to be granted against InTrust.

As we have ruled that a pro tanto credit must be granted, it becomes necessary to decide what items of damages the credit should be applied toward.

The Yorks' fallback position from denying that any credit should be granted is that no credit should be granted against the punitive damages that were awarded, citing *Smith v. Printup*, 254 Kan. 315, 356, 866 P.2d 985 (1993). The Yorks also argue that because Delmar might have been found to have violated K.S.A. 58-3062(a)(4), (22), and (34) of the Real Estate Brokers' and Salespersons' License Act, we should apportion an imaginary amount of the $65,000 settlement to represent punitive damages and not allow any credit as to that amount. We are singularly unimpressed with a request for this court on appeal to make any such allocation.

InTrust cites no Kansas case as to the allowance of a pro tanto credit against the punitive damages award but cites *Richards v. Michelin Tire Corp.*, 786 F. Supp. 964 (S.D. Ala. 1992), *vacated on other grounds* 21 F.3d 1048 (11th Cir. 1994), *cert. denied* 513 U.S. 1111 (1995), for allowing a credit against punitive damages. InTrust points to the wording of the covenant not to sue, which stated that it included but was not limited to "all claims made against [the settling codefendants] in the Lawsuit." InTrust argues such language encompasses any claim for punitive damages based on the same alleged wrongs complained of against InTrust, making it appropriate for the credit to be applied to the entire judgment, including the punitive damages award.

The question as to whether a pro tanto credit should be granted against the amount of punitive damages awarded is governed by our decision in *Printup*, where we said:

"The imposition of joint and several liability for punitive damages is contrary to the purpose for which punitive damages are awarded. Punitive damages are awarded to punish the wrongdoer. Each wrongdoer is liable to pay the punitive damages assessed against him or her. The amount of the award is to be calculated

with the individual defendant's financial status and conduct in mind. K.S.A. 1992 Supp. 60-3701(b), (e) and (f). Joint and several liability undermines these considerations and therefore is unavailable. In contrast, joint and several liability for compensatory damages, under appropriate circumstances, is consistent with their purpose, which is to compensate the tort victim." 254 Kan. at 356.

It would be totally inappropriate to the purposes for which punitive damages are awarded to allow any portion of the $65,000 settlement payment made by Russell and Delmar to inure to the benefit of InTrust insofar as the jury found and the trial court awarded punitive damages. A defendant is not entitled to apply a pro tanto credit to any amount awarded as punitive damages or to apply a pro tanto credit of any amount previously recovered which was specifically allocated as punitive damages.

Although we agree with the Yorks' argument that the settlement payments made by Russell and Delmar should not relieve InTrust of any portion of the punitive damages awarded against it, we decline to accept the Yorks' invitation to make an allocation of the $65,000 settlement to represent any amount of punitive damages which might have been allowed against either Russell or Delmar. To do so would be contrary to the agreement, which expressly stated it was "not to be construed as an admission of liability" on the part of Delmar or Russell.

The $65,000 settlement may be applied against the remainder of the judgment, but not against any portion of the punitive damages awarded by the court. The $7,500 in punitive damages is awarded to the Yorks as a separate judgment, unreduced by any amount of the settlements.

We have by the foregoing answered all of the questions raised by the Yorks' cross-appeal. This leaves only the issue of attorney fees and expenses on appeal for our final consideration.

*What amount, if any, should the Yorks be allowed for their attorney fees on appeal?*

The Yorks have properly filed a motion for the award of attorney fees and costs on appeal, contending they may be granted in this court's discretion pursuant to K.S.A. 50-634(e). The amount claimed is $26,833.81, plus expenses in the sum of $1,207.33.

InTrust filed an objection, contending that fees should not be allowed, as such allowance is purely discretionary, that fees should be limited only to the KCPA issues; and that expenses should not be granted, citing *DeSpiegelaere v. Killion,* 24 Kan. App. 2d 542, 947 P.2d 1039 (1997).

The Yorks' response asserts that the time their attorneys have claimed for fees relates to the KCPA issue, which arises out of an inseparable transaction; thus, *DeSpiegelaere* is distinguishable because there the claimed fees were not segregated between KCPA and non-KCPA claims which arose out of separate acts. The Yorks also correct their claim for expenses by properly attributing printing charges to costs and reducing the claimed amount to $789.30.

We have considered all of the parties' arguments and find that the allowance of reasonable attorney fees necessarily includes expenses, notwithstanding that K.S.A. 50-634(e) does not expressly state that "expenses" are included. We held in *Sheila A. v. Whiteman,* 259 Kan. 549, 566, 913 P.2d 181 (1996), that expenses are a part of reasonable attorney fees, and we also so hold here.

In addition, we determine, as did the trial court, that this is a case where attorney fees should be allowed. We grant the Yorks' motion and allow attorney fees to the Yorks against InTrust in the amount of $22,500 and expenses of $789.30 for services provided on appeal. These amounts are to be included in the trial court's judgment to be rendered upon remand. The allowance of additional amounts of attorney fees, if any, upon remand shall be determined by the trial court.

Although we believe the trial court and the parties should be able to compute the judgment to be entered from what we have said, we set forth the following summary to show the judgment which should be entered in favor of the Yorks against InTrust:

| | |
|---|---|
| Punitive damages | $ 7,500.00 |
| Not reduced by any amounts of the settlements | |
| Increased mortgage interest costs | * |
| Increased construction costs | $ 8,000.00 |
| Expense of temporary housing | $ 4,200.00 |
| Increased contractors' fees | $ 3,750.00 |

| | |
|---|---:|
| Lost mortgage interest income tax deductions | $ 1,350.00 |
| Attorneys fees for trial | $45,000.00 |
| Expenses for trial | $ 1,328.28 |
| Attorney fees on appeal | $22,500.00 |
| Expenses on appeal | $ 789.30 |
| Attorney fees and expenses on remand | * |
| Court costs | * |
| Less the Delmar/Russell settlement | −$65,000.00 |
| Less the West settlement | − * |
| Total judgment to be entered | $ _____ |

(* = To be determined by the trial court on remand)

The issues raised by the appeal are affirmed. The issues raised by the cross-appeal are affirmed in part and reversed in part. The matter is remanded to the trial court for further proceedings in accordance with the instructions set forth herein.