No. 125,657

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STEVEN K. BRINKER and CUSTOM SPECIALTIES, LLC,
*Appellants,*

v.

ROBERT J. MCCASLIN et al.,
*Defendants,*

and

JACK MUHLSTEIN, SPROUT CAPITAL GROUP, LLC, and ACCESS ASIA USA, LLC,
*Appellees.*

SYLLABUS BY THE COURT

1.

Civil conspiracy is a way to hold a conspirator directly liable for damages caused by an unlawful act of a co-conspirator committed in furtherance of the conspiracy.

2.

Any act done by any conspirator in furtherance of the common design and in accordance with the general plan becomes the act of all, and each conspirator is responsible for such act. Thus, a plaintiff need not prove that each conspirator committed a wrong giving rise to a cause of action independent of the alleged conspiracy.

3.

Kansas recognizes five elements to establish liability for conspiracy: (1) at least two people; (2) an object to be accomplished; (3) a meeting of the minds by those people in the object to be accomplished or the course of action; (4) at least one unlawful overt act by one of those people; and (5) damages proximately caused by the act(s).

4.

To establish the fourth element of their conspiracy claim, a plaintiff need only show that a conspirator's overt wrongful acts were committed in furtherance of an express or implied agreement with a co-conspirator or a unity of purpose shared with a co-conspirator.

5.

While a plaintiff need not show that each conspirator committed an overt wrongful act, they must still show a meeting of the minds between co-conspirators which a conspirator's overt wrongful acts were designed to further. This meeting of the minds element of the claim prevents someone from becoming inadvertently liable for another's wrongs.

6.

A plaintiff can recover from any conspirator any damages that are the natural and probable result of the conspiracy.

Appeal from Johnson District Court; PAUL C. GURNEY, judge. Oral argument held July 11, 2023. Opinion filed October 20, 2023. Affirmed in part, reversed in part, and remanded with directions.

*Jack D. McInnes*, of McInnes Law, LLC, of Prairie Village, and *Anthony W. Bonuchi*, pro hac vice, of Bonuchi Law, LLC, of Kansas City, Missouri, for appellants.

*Daniel R. Luppino* and *Scott A. Wissel*, of Lewis Rice LLC, of Kansas City, Missouri, for appellees.

Before COBLE, P.J., GARDNER and CLINE, JJ.

CLINE, J.: Steven K. Brinker contends his former business partner, Robert J. McCaslin, sabotaged their business so McCaslin could start up a competing business (M2

2

Promotional Products LLC, or M2PP) with a new partner, Jack Muhlstein. Brinker sued McCaslin, Muhlstein, M2PP, and several companies controlled by Muhlstein, alleging claims for breach of fiduciary duty, conspiracy to breach fiduciary duty, tortious interference with contract and business expectancies, and violations of the Kansas Uniform Trade Secrets Act (KUTSA). The district court allowed the claims against McCaslin and M2PP to go forward but granted summary judgment as to the claims against Muhlstein and his companies. Plaintiffs appeal that decision.

We find no error in the district court's order granting summary judgment on the claims against Muhlstein's companies, so we affirm that portion of its decision. But we find genuine questions of material fact exist which prevent summary judgment on the claims against Muhlstein. We therefore reverse the court's decision granting summary judgment on those claims and remand the case for further proceedings.

FACTS

This matter is densely factual, which is ultimately reflected in our decision to reverse the district court's summary judgment order based on the existence of genuine and material factual disputes. While we address additional facts as pertinent to our decision on the various claims, we outline the dispute as follows.

Plaintiff Custom Specialties, LLC (CSI) is a promotional products company. Its business involves purchasing products from suppliers, decorating them with a customer's company logos and the like, and then packaging and delivering them according to the customer's specifications.

After working at CSI for several years, Brinker and a former coworker, Pat Hughes, bought out the founder's interest and became 50/50 co-owners in 2005. After

3

Hughes passed away in July 2017, Brinker purchased his interest and became the sole owner of the company.

Brinker met McCaslin in 2013 through CSI's relationship with the bank where McCaslin worked. After Hughes' death, McCaslin contacted Brinker and expressed an interest in becoming a partner in CSI. While they continued to discuss this possibility, Brinker provided McCaslin with CSI financial documents to help McCaslin evaluate a potential deal.

McCaslin told Brinker that since McCaslin was a service-disabled veteran, CSI could potentially become eligible for certification as a Service-Disabled Veteran-Owned Small Business (SDVOSB). Status as an SDVOSB would give CSI contracting advantages in the market, including the ability to bid on certain government contracts. Yet for CSI to qualify for this certification, McCaslin would have to be the majority owner.

In April 2018, Brinker and McCaslin entered an agreement for McCaslin to buy a 51% interest in CSI, with Brinker retaining a 49% ownership interest. The purchase agreement called for McCaslin to pay Brinker $100,000 in exchange for his ownership interest, plus an additional deferred payment to be calculated and come due on or about May 15, 2022. At closing, McCaslin failed to pay the full purchase price, but Brinker allowed him to pay $50,000 up front and agreed to accept the remainder later.

Along with the purchase agreement, Brinker and McCaslin executed a new CSI operating agreement naming McCaslin as a member with a 51% ownership interest and the manager of the company. Because McCaslin became the majority owner and manager, the operating agreement granted him almost unlimited authority to manage the business as he saw fit. That said, the operating agreement required McCaslin to "exercise

such rights and duties in the capacity of a fiduciary" and "govern the Business and affairs of [CSI] based upon those standards."

*CSI's financial struggles*

McCaslin took over as CSI's manager at the beginning of May 2018. From the start of his tenure, the company was undergoing financial difficulties. While 2014 and 2015 saw CSI post its highest gross revenues since Brinker became owner, 2016 was an average year and 2017 was a down year, with CSI posting its lowest gross revenues during Brinker's ownership. As a result, comparing 2014 and 2018, revenues declined nearly $4 million—a 40% reduction.

As of April 20, 2018, CSI owed $221,046 in vendor accounts that were more than 60 days past due and an additional $158,393 in vendor accounts that were more than 90 days past due. In July 2018, McCaslin and Brinker received a letter from CIBC Bank which declared a default under CSI's line of credit with the bank, referenced an existing default in February 2017, and demanded immediate payment of $486,269.93. Also in September 2018, Brinker and McCaslin received an e-mail from Facilisgroup, a third-party vendor that provided CSI with order processing services, indicating that CSI had a past due account of more than 90 days. In December 2018, CSI's landlord notified CSI that it was three months behind on its rent. And on February 4, 2019, the landlord contacted CSI about its continued default, stating that it needed to pay its balance by that week, or the matter would be sent to outside counsel for collection.

Brinker had personally guaranteed CSI's line of credit with CIBC Bank, credit card debt with American Express, and the lease agreement.

Yet, there were also positive developments. In September 2018, CSI signed a five-year contract with Evergy that McCaslin described as a "big deal" for the company.

Further, as of October 2018, McCaslin admitted that CSI had landed 18 new clients, which he estimated would increase sales by $2.5 to $3 million. In November 2018, CSI was certified as a SDVOSB by the Department of Veterans Affairs. And on February 12, 2019, CSI signed a new five-year contract to supply promotional products to employees of Terracon Consultants, Inc.

During this period, McCaslin and Brinker were also working to secure a new line of credit with Core Bank to consolidate CSI's outstanding debt into a more favorable loan and provide CSI with more operating capital to fulfill larger orders.

*McCaslin meets Muhlstein*

In November 2018, McCaslin was introduced to Jack Muhlstein. According to McCaslin, Muhlstein served on the board of the company for which McCaslin's wife worked, and she mentioned to Muhlstein in conversation that McCaslin had bought a promotional products company. Muhlstein told her that he would like to meet McCaslin, and the two spoke over the phone shortly after. McCaslin said he originally sought out Muhlstein's advice about the situation at CSI and hoped Muhlstein would offer help if McCaslin was having financial trouble with the business.

In the following days, McCaslin sent Muhlstein various documents, including CSI tax returns, year-end financials, company debts, and information about CSI's sales commission structure. Muhlstein responded by asking about the structure of the partnership and who guaranteed the company debt, among other things.

In December 2018, McCaslin provided Muhlstein with his Facilisgroup login credentials, which gave Muhlstein access to all of CSI's sales and customer and sales representative information. In late January 2019, McCaslin shared with Muhlstein the preliminary year-end numbers for 2018 as well as a sales analysis for 2019. And on

6

February 3, 2019, McCaslin shared with Muhlstein the presentation CSI used to land Evergy as a client.

Muhlstein described his activities during this initial period as providing uncompensated mentoring to McCaslin. He said neither party intended at the start of the relationship for Muhlstein to become a partner in the business. Muhlstein said McCaslin shared information with him so that he would understand the nature and the standing of the company and its history, with the aim of helping CSI. Muhlstein further stated that he understood the information McCaslin sent him was confidential and he treated it as such.

*Muhlstein's proposal to buy an ownership interest in CSI*

On February 11, 2019, McCaslin told Brinker that Muhlstein was interested in acquiring a significant portion of Brinker's ownership interest in CSI. McCaslin followed up on this discussion the next day by e-mailing Brinker terms of the proposed agreement. These terms included Brinker transferring 35% of his 49% ownership share in CSI to Sprout Capital Group LLC (one of Muhlstein's companies) for $1. Brinker was to serve as an executive salesperson on a commission basis with no further compensation or expense reimbursements and no management involvement unless otherwise requested by McCaslin or Sprout. And McCaslin would be granted the option to buy Brinker's remaining shares at any time for the net asset value of the shares in the company. In his e-mail to Brinker, McCaslin referred to himself as "Mr. M II" and Muhlstein as "Mr. M I."

The proposed agreement explicitly did not integrate the bank debt personally guaranteed by Brinker but stated that McCaslin would "work with the current banking relationship and keep them happy or to gain a new one (if possible)."

Brinker rejected this offer.

7

*Muhlstein's increased involvement in CSI*

In late February 2019, Muhlstein became more involved in the day-to-day operations of the company, at McCaslin's request.

On February 18, Muhlstein e-mailed McCaslin a list of topics for discussion at an upcoming meeting between the two. These included replacing Julie Bitner as CSI's controller, providing Muhlstein with financial data for January and CSI's current accounts receivable list, setting up an e-mail address for Muhlstein, and "Landlord, Move lease etc."

On February 20, Muhlstein began advancing the cost of purchasing goods to fulfill certain orders on behalf of CSI, as well as charging CSI consulting fees. The record contains five invoices that Muhlstein, through Access Asia USA, LLC, submitted to CSI between February 22 and April 9, 2019. Two of these invoices were linked to purchases of specific merchandise, but the other three were notated merely as a "consulting" or "management" fee.

While the invoice itself is not contained in the record, Muhlstein also apparently submitted a sixth invoice to CSI on April 4, as shown by an e-mail thread between Bitner and McCaslin. While the invoice was for $18,742, Bitner stated that Muhlstein had only contributed $11,340 and the $7,402 fee he was charging seemed "a little steep to [her]." She presumed the fee must have either been calculated incorrectly or the result of a misunderstanding on Muhlstein's part, and she asked McCaslin to review the invoice before CSI paid it.

On February 24, McCaslin e-mailed a copy of CSI's current lease agreement to Muhlstein. McCaslin claims he asked Muhlstein to contact the landlord on his behalf, and Muhlstein talked to the landlord about a plan to move into a smaller space and catch up

8

on back rent. Later that day, however, McCaslin contacted another company, Mather Real Estate, requesting more information about a potential new location for the business.

Also that same day, McCaslin e-mailed Muhlstein CSI's December 2019 financials and once again referred to himself as "Mr. M2" and Muhlstein as "Mr. M1."

On February 25, McCaslin and Muhlstein met with Bitner. They told her there were new procedures she must follow as controller, including: (1) she would not be making any decisions about payments; (2) all decisions would be made by McCaslin or Muhlstein; and (3) she was not to discuss any financial information with anyone other than McCaslin or Muhlstein, not even Brinker. She found this very concerning as Brinker had not mentioned that he would be completely out of the picture on financial decision-making. Bitner said when she raised these concerns with McCaslin, he told her Brinker was aware of the changes and implied that he and Brinker were on the same page regarding the changes. Bitner did not discuss any of this with Brinker in accordance with McCaslin's instruction that she was not to discuss financial information with anyone other than him or Muhlstein.

Muhlstein also asked Bitner to submit a "cash report" to him. That evening, slightly after midnight, she e-mailed him a first attempt at the requested report. Muhlstein replied to this e-mail the next morning by reminding Bitner to not make any disbursements, transfers, or payments of any kind without McCaslin's express permission. He asked for her cell phone number and said he would contact her with questions.

Also on February 25, McCaslin directed Bitner to reverse a payment on CSI's American Express card that was made several days earlier, after Bitner told McCaslin the bank had informed her that two checks were about to bounce. Bitner said McCaslin never explained why he cancelled the American Express payment. She stated that it was not

9

strictly necessary for cash flow reasons, as they had a large recurring customer payment scheduled to come in that day, and although it was late, it came soon after, giving them enough cash to cover both the American Express payment and the checks.

According to Bitner, the cessation of payments on the American Express card made running the business much more difficult and, in her opinion, was harmful to CSI because they then had to prepay all orders and therefore could not deliver on orders. The situation snowballed quickly from what Bitner felt was a reasonable situation to an "unmanageable" one. When they could not process sales as a result and had to push back orders, they began losing customers.

On February 28, McCaslin asked Mather Real Estate to send information on the new prospective location to "me and my partner . . . Jack [Muhlstein]" and copied Muhlstein on the e-mail. From there, Muhlstein took over negotiations for McCaslin to sign a new lease at a property owned by Mather Real Estate. Brinker was not involved in these discussions. According to Brinker, this new property did not have enough space to house CSI's existing inventory or allow the company to fulfill the orders for contracts it had recently landed.

*McCaslin creates M2PP*

On March 12, McCaslin organized and registered M2PP with the Kansas Secretary of State. McCaslin said Muhlstein's involvement in M2PP was much the same as his involvement in CSI and that he was "advising" M2PP. He denied that Muhlstein was an investor or creditor in M2PP. And he testified that while the two did not have a formal agreement, he hoped Muhlstein would eventually provide financing to M2PP.

Brinker knew nothing about M2PP's creation.

10

On March 25, Muhlstein sent McCaslin a "to-do" list with items for McCaslin to accomplish, including opening new bank accounts for both CSI and M2PP, managing all financial activity to sweep into the new CSI account, and blocking all payments without McCaslin's express permission. The e-mail also contained these directions:

"New Hy-Vee order AS TEST TO TRANSITION TO m2[.]
"Run simultaneously for 90-120 days and assess situation[.]
"High gear to M2 and book through ASI[.]
"Cut CSI costs to survive[.]"

McCaslin claimed this discussion related to CSI's potential use of a new order processing software system, ASI, because of the threat of Facilisgroup cutting off access to their current order processing software. The "test" was to make sure that the new system could service Hy-Vee should Facilisgroup cut them off. He added that the purpose of running them simultaneously for 90-120 days was to make sure that if Facilisgroup cut them off they would have a fully functioning replacement system in place.

That said, when pressed about forming M2PP to test and ultimately switch to a new order processing software, McCaslin stated the purpose of forming a new company to run the software was not only to address the potential Facilisgroup issue but also to solve CSI's working capital and credit issues with their suppliers. Upon further questioning, McCaslin stated that M2PP was formed to be a distributor for CSI, which itself would have been turned into a "sales organization," with the plan being that CSI would process orders through M2PP so that they could avoid credit and working capital issues. According to McCaslin, the software needed to be in M2PP's name, or they would not be able to obtain new capital or favorable credit terms from suppliers.

11

On March 28, Bitner e-mailed McCaslin about ensuring they had sufficient funds to cover various outgoing payments with the American Express payment coming due. McCaslin responded by informing her that he had "smoked the Amex."

On April 3, Muhlstein e-mailed McCaslin stating, "Please let me know outcome when you call Hy-Vee this morning re M2[.] This is a critical step[.]"

*McCaslin's departure from CSI*

On April 5, McCaslin e-mailed Brinker to inform him that "due to financial reasons and [Brinker's] new role as a 1099 Sub Contractor," CSI would no longer be providing him with health insurance.

Three days later, CSI's corporate counsel sent a letter to McCaslin, apparently at Brinker's direction, telling McCaslin he had breached the CSI purchase agreement by failing to pay Brinker the remaining $50,000 of the purchase price. The letter further demanded McCaslin resign from his position as manager of CSI immediately and return his ownership interest to Brinker.

Upon receiving this letter, it appears McCaslin e-mailed it to Muhlstein. He then sent four e-mails to his personal Hotmail account with various attachments containing what appear to be CSI company information.

On April 9, Access Asia sent an invoice to CSI for $23,912, purportedly for an order of pens for Hy-Vee. Muhlstein admitted that this figure included a markup like the other invoices he sent to CSI, but explained that whatever markup he was charging, as with the other invoices, was added to build up a cash reserve he could use to buy more items for CSI.

12

That same day, McCaslin e-mailed Muhlstein stating: "Here is a splashing of a few of my accounts." He attached a spreadsheet titled: "Client Movement to M2." This spreadsheet included a list of 14 CSI clients—including Evergy, Terracon, and Hy-Vee—as well as the name and title of the contact person and the projected revenue associated with each client. Using an M2PP company e-mail address, Muhlstein responded with "FYI," and included an M2PP company logo and signature block at the bottom of his e-mail. The logo signified that M2PP was certified as an SDVOB. And the M2PP contact information in the signature block included the same telephone number Muhlstein listed as a contact number for one of his companies, Golden Fortune Industries, LLC, and a post office box address in Morris Plains, New Jersey, which is the same town where Golden Fortune was located.

McCaslin claimed he sent this e-mail to show Muhlstein the accounts they could move to M2PP to process orders. He admitted these were CSI's largest customer accounts and maintained that moving the largest clients was necessary because they posed the biggest capital issues for CSI.

On April 10, McCaslin e-mailed Dan Strait, an employee of Hy-Vee, seemingly requesting that Strait switch the vendor to be paid on at least some of Hy-Vee's promotional products orders from CSI to M2PP. McCaslin admitted that he updated Muhlstein about his discussions with Hy-Vee after e-mailing Strait.

Also on April 10, McCaslin apparently presented a proposal for a new inventory program to Terracon.

On April 12, Muhlstein and McCaslin met with the two CSI salespeople in charge of the Hy-Vee account. McCaslin said the purpose of this meeting was to talk to them about working with McCaslin and Muhlstein to "get the Hy-Vee orders placed and to make them aware that because of the size of the orders, [CSI] didn't have the strength or

the financial capacity to process the orders." McCaslin admitted they spoke to the sales staff about using M2PP to process all Hy-Vee orders as a solution to this problem.

Three days later, on April 15, both salespeople resigned their employment with CSI. They took Hy-Vee with them as a client when they left.

During this same period, McCaslin was engaged in an e-mail conversation with a representative of Arrived Outdoors—a CSI customer—about McCaslin paying an outstanding invoice. After failing to respond to several of the representative's e-mails from April 9-19, McCaslin wrote back on April 20: "Sorry about the delay. I've been shutting one company down while starting another, so life has been a little crazy."

On April 26, a Terracon representative sent a letter to McCaslin stating:

"[M]y emails and voice mails to you recently have been going unanswered. I have specifically requested information regarding our account representation, knowing there was a change, which was not communicated to us from [CSI] directly. I want to know how this update impacts our account and how our pending orders are being transitioned and managed."

The letter then informed McCaslin that Terracon was formally rejecting the proposal for the inventory program presented on April 10 but would move forward purchasing existing inventory from CSI. It stated that Terracon would no longer be participating in the monthly pre-order program and asked McCaslin to cancel any planned sales. The letter reiterated that Terracon would continue engaging CSI for transactional orders and would like to continue business as usual but would not be spending resources to implement new technologies. The letter concluded by stating: "Our hope is that CSI takes this opportunity to make considerable improvements on how our account is managed, including customer service, response time, and general communication. I would like to regroup in approximately 30 days to discuss next steps."

On April 29, McCaslin sent Brinker his formal written resignation as manager and returned his ownership interest in CSI.

Two days later, McCaslin sent a letter to CSI's contact person at Evergy. This letter stated that McCaslin had resigned his management and ownership in CSI and had contacted the Veterans Administration to let them know CSI was no longer veteran owned and therefore ineligible for SDVOSB certification. McCaslin explained that

> "[a]fter a year of fighting that fight, I decided that if I am going to go through a daily financial battle like that, it['s] going to be for a company which could operate more cleanly and simply on day one. Therefore, we proudly announce the launch and execution of, 'M2 Promo Products, LLC.'"

The letter mentioned that McCaslin had formed an informal partnership with Muhlstein and touted Muhlstein's years of business experience in imports and exports, adding it would provide "tremendous value for what we are preparing for."

The letter then informed the Evergy representative that M2PP was headquartered in Kansas City with sales offices in Kansas City and New Jersey and was a "100% Disabled Veteran Owned Small Business." It stated that while a formal press release on the launch of the company was forthcoming, they wanted to let their closest friends and associates know they were open for business. He invited the Evergy representative to stop by and visit and revealed that M2PP's offices were in the same building as Arrived Outdoors.

*Additional developments following McCaslin's departure*

In May, CIBC Bank sent a letter to McCaslin and Brinker stating that CSI had defaulted on its line of credit with the bank. The letter added:

15

"Since that time, the Bank has learned that [CSI's] financial condition has significantly deteriorated, that Brinker may intend to initiate litigation against a principal of [CSI], and that [CSI] has lost the benefit of a critical contractual and business relationship, the facts and circumstances of which have added to the [existing] defaults communicated in July . . . 2018."

The bank demanded immediate and full payment of $471,610.78 or it would initiate lawsuits against CSI and any guarantors.

On May 6, Evergy notified CSI that it was terminating its contract with CSI. On July 31, Terracon e-mailed Brinker to discuss terminating their relationship with CSI. The e-mail referenced "severe shipping delays" which Terracon had experienced after choosing not to move forward with the new inventory model CSI had proposed.

CSI's landlord eventually sued CSI and Brinker for breach of CSI's lease agreement and was ultimately awarded a judgment for $146,850.85. And American Express obtained two judgments against Brinker as guarantor for a total of $132,978.98.

*Brinker and CSI file suit*

Brinker and CSI (Plaintiffs) sued McCaslin, Muhlstein, M2PP, Access Asia, and Sprout (Defendants) in September 2019. Defendants eventually moved for summary judgment on all claims. The district court denied summary judgment on Plaintiffs' claims against McCaslin and M2PP but granted it on their claims against Muhlstein, Sprout, and Access Asia. And it certified its judgment as a final and appealable order under K.S.A. 60-254(b) after finding no just reason for delay of an appeal of this order.

ANALYSIS

On appeal, Plaintiffs challenge the district court's decision granting summary judgment on their claims against Muhlstein and his two companies for: (1) conspiracy to breach McCaslin's fiduciary duty and his duty of loyalty to Plaintiffs; (2) tortious interference with Plaintiffs' contract and business expectancies; and (3) violations of the KUTSA.

*Standard of review*

We owe no deference to the district court's summary judgment decision or rationale when reviewing that decision on appeal. Instead, we look at the facts and law anew, applying the same standards which district courts must apply when reviewing summary judgment motions:

> "Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Any court considering the motion must resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom summary judgment is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. To preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. The court must deny a motion for summary judgment if reasonable minds could differ over the conclusions drawn from the evidence. [Citations omitted.]" *Hernandez v. Pistotnik*, 58 Kan. App. 2d 501, 505, 472 P.3d 110 (2020).

*Did the district court err in granting summary judgment on Plaintiffs' conspiracy claim against Muhlstein?*

Plaintiffs maintain that McCaslin and Muhlstein conspired to transition CSI's business and value to M2PP and leave Brinker saddled with hundreds of thousands of dollars of debt that he personally guaranteed on behalf of CSI. They sued McCaslin for breaching his duty of loyalty and his fiduciary duties to Plaintiffs, and they sued Muhlstein for conspiring with McCaslin to breach those duties.

In granting summary judgment for Muhlstein, the district court determined M2PP was not created to compete with CSI and there was no evidence in the record that Muhlstein had contact with any of CSI's customers or acted to divert any customer away from CSI. It also found Plaintiffs could not establish Muhlstein committed any "overt act" or engaged in any independently actionable conduct to further McCaslin's alleged breaches of his duties. Therefore, it held that the conspiracy claim was factually unsupported and legally invalid.

*Whether Plaintiffs properly challenge the district court's Rule 141 comments*

The district court announced its ruling on the summary judgment motions on the record before later issuing a journal entry. When explaining its ruling on Muhlstein's motion, the district court made two general observations. It noted at one point that many of Plaintiffs' additional statements of fact in their response were not supported by the referenced record. It also remarked that Plaintiffs did not actually controvert Defendants' fact statements.

Defendants first argue that Plaintiffs' appeal is futile because Plaintiffs did not challenge these general statements on appeal. Defendants claim this means we must assume that each of the facts on which the district court relied was properly supported and uncontroverted as a matter of law. See, e.g., *Lopez v. Davila*, 63 Kan. App. 2d 147, 152-53, 526 P.3d 674 (2023) (party who presented no argument over the district courts

18

findings on compliance with Supreme Court Rule 141 [2022 Kan. S. Ct. R. at 224] failed to meet his burden to show abuse of discretion by the district court).

Yet as Plaintiffs note, the district court did not specify any particular statements which it found were uncontroverted or unsupported based on application of Rule 141. Given the generic nature of the district court's comments, we do not find Plaintiffs are foreclosed from proceeding, nor do we find our standard of review altered. We review the district court's ruling in the same way we review all summary judgment rulings and similarly apply Rule 141 when analyzing each party's pleadings. This includes reviewing Plaintiffs' responses to Defendants' statements of fact and Plaintiffs' additional statements of fact to determine both whether the statements are supported by the record and whether they controvert the responsive statements—and vice versa.

*Civil conspiracy*

Civil conspiracy is a way to hold a conspirator directly liable for damages caused by an unlawful act of a co-conspirator committed in furtherance of the conspiracy. Kansas recognizes five elements to establish liability for conspiracy: (1) at least two people; (2) an object to be accomplished; (3) a meeting of the minds by those people in the object to be accomplished or the course of action; (4) at least one unlawful overt act by one of those people; and (5) damages proximately caused by the act(s). *Stoldt v. City of Toronto*, 234 Kan. 957, 967, 678 P.2d 153 (1984); *Vaughan v. Hornaman*, 195 Kan. 291, 299, 403 P.2d 948 (1965).

Any act done by any conspirator in furtherance of the common design and in accordance with the general plan becomes the act of all, and each conspirator is responsible for such act. Thus, not only is a conspirator liable for his own actions in the commission of a conspiracy, but he will also be held accountable for his co-conspirator's conduct. 195 Kan. at 299 (A conspiracy "'may be pleaded and proved . . . for the purpose

19

of holding one defendant responsible for the acts of his co-conspirators.'") (quoting *Nardyz v. Fulton Fire Ins. Co.*, 151 Kan. 907, 911, 101 P.2d 1045 [1940]; 15 C.J.S., Conspiracy § 25); *Vetter v. Morgan*, 22 Kan. App. 2d 1, 7, 913 P.2d 1200 (1995) ("One person may be liable for the tortious conduct of another when they act in concert.").

Plaintiffs contend that Muhlstein conspired with McCaslin to transition CSI's business and value to M2PP, while leaving Brinker saddled with CSI's debts, which he had personally guaranteed. They argue McCaslin created M2PP as part of this plot to siphon clients away from CSI, and Muhlstein instructed McCaslin in the commission of various acts which sabotaged CSI. Plaintiffs claim these acts breached McCaslin's fiduciary duties under the operating agreement, which required him to act in the best interests of CSI and to refrain from self-dealing, including using company property and assets for his own benefit. See *Becker v. Knoll*, 291 Kan. 204, 208, 239 P.3d 830 (2010) (fiduciary duty requires that corporate directors act in their shareholders' best interests and not enrich themselves at their expense); see also *Carson v. Lynch Multimedia Corp.*, 123 F. Supp. 2d 1254, 1264 (D. Kan. 2000) (limited liability corporation operating agreement can impose fiduciary duties on an LLC manager or member). Plaintiffs allege damages from these acts in the form of debts which Brinker must now pay and the loss of CSI's value.

Defendants, for their part, contend Plaintiffs cannot establish most of the required elements of conspiracy. They claim innocent motives for their actions and dispute both the existence of a conspiracy and the connection between Plaintiffs' damages and those actions.

But Defendants rely on a myopic view of the evidence and a mistaken understanding of Kansas conspiracy law. When resolving all disputed facts and all inferences which may be reasonably drawn from the evidence in Plaintiffs' favor, we find reasonable minds could differ on the conclusions drawn from the evidence. This means

20

summary judgment should have been denied on Plaintiffs' conspiracy claim against Muhlstein.

*Plaintiffs have established a triable issue of fact as to the conspiracy's existence.*

Defendants first argue that Plaintiffs have failed to establish the existence of the alleged conspiracy, i.e., an object to be accomplished and a meeting of minds to accomplish the object. Defendants contend McCaslin created M2PP to assist CSI, not steal its business. In support, they allege that McCaslin claimed M2PP was created to help with processing orders if Facilisgroup cut off CSI's access to its software. They contend this reasoning makes sense, given the financial difficulties CSI was experiencing at the time.

Defendants maintain that their allegations about M2PP's purpose are uncontroverted because Brinker admitted he knew nothing about M2PP's creation or purpose and Plaintiffs failed to present testimony from other witnesses to support Plaintiffs' allegations about the purpose behind M2PP and Muhlstein's involvement. They also allege that the e-mails Plaintiffs cite to support their conspiracy claim align with Defendants' position on M2PP's purpose, not Plaintiffs'.

Our Supreme Court has cautioned against granting a motion for summary judgment when resolution of the issue requires determining the state of mind of a party. *Hustead v. Bendix Corp.*, 233 Kan. 870, 873, 666 P.2d 1175 (1983). We find such caution appropriate here. We do not read the record as conclusively establishing McCaslin and Muhlstein's motives and intent in forming M2PP and dealing with CSI and its customers. A reasonable person could conclude they intended M2PP to be a standalone company they could use to compete with CSI, rather than merely a way to test a potential new software system. Since there remains a genuine issue of material fact on this crucial point, summary judgment was improper.

21

To begin, Defendants' assertion that M2PP was created solely as a software processing platform, as a precautionary measure in case Facilisgroup cut off services due to nonpayment from CSI, is undercut by McCaslin's own testimony. McCaslin said the reason he needed to start a *separate company* to run the new order processing software was not because of the threat of Facilisgroup being cut off, but so that he could use M2PP to process sales from CSI's customers while avoiding CSI's credit and working capital issues. Muhlstein's testimony corroborates this explanation by suggesting that he and McCaslin developed the idea for M2PP in response to Brinker's rejection of Muhlstein's offer to buy into CSI.

Next, while Defendants fault Plaintiffs for failing to produce direct evidence to support their allegations of conspiracy, the absence of direct evidence of an alleged conspiracy is quite common. Such evidence is ordinarily in the possession and control of the alleged conspirators and often out of reach of the opposing party. *Beverly v. McCullick*, 211 Kan. 87, 98, 505 P.2d 624 (1973). For this reason, a conspiracy may be proven by either showing the conspiracy itself or by showing the separate acts of the conspirators involving the same purpose or object. *York v. InTrust Bank, N.A.*, 265 Kan. 271, 295, 962 P.2d 405 (1998). And the connection between these acts may be shown using circumstantial evidence. *Beverly*, 211 Kan. at 98.

Plaintiffs support their conspiracy claim by pointing to several acts, statements, and e-mails by McCaslin and Muhlstein from which they contend a reasonable person could infer a conspiracy between them to form a new company (M2PP) to steal CSI's most valuable clients and leave Brinker with its debt. We find these inferences reasonably drawn from the evidence and plausible enough to preclude summary judgment.

For instance, McCaslin formed M2PP about a month after Brinker declined Muhlstein's purchase offer. Soon after, Muhlstein instructed McCaslin on opening new bank accounts for both CSI and M2PP, managed all financial activity to sweep into the

22

new CSI account, and blocked all payments without McCaslin's express permission. Muhlstein and McCaslin also discussed "transitioning" CSI clients to M2PP, with McCaslin disclosing specific accounts and their projected revenue in a document entitled "Client Movement to M2."

McCaslin was referring to Muhlstein as his "partner" as early as February 2019, even dubbing them "Mr. M I" and Mr. "M II." He also entrusted Muhlstein with negotiating the new lease. As for Muhlstein, he was using an M2PP company e-mail address in April to send McCaslin e-mails, which included an M2PP logo and signature block that shared contact information with one of Muhlstein's companies. And he instructed CSI's controller to cut Brinker out of financial decisions.

McCaslin's May 1 letter to Evergy evidences that by at least April he intended to operate M2PP as a full-fledged company providing the same services as CSI. As the letter made clear, by that point M2PP had secured office space (in the same building as a CSI customer) and was open for business. He explained that the reason he formed M2PP was he realized he wanted to spend his energy working for "a company which could operate more cleanly and simply on day one." In this letter, McCaslin said he had "formed an informal partnership" with Muhlstein "[i]n the past few months" and touted Muhlstein's business expertise and experience as a valuable addition to the M2PP venture. Finally, McCaslin also told one of CSI's customers that his delay in responding to that customer's e-mails was because he had been busy "shutting one company down while starting another."

Ultimately, the central question is whether Plaintiffs have alleged sufficient facts from which a jury could reasonably find the existence of the alleged conspiracy. Because answering this question involves resolving conflicting factual inferences drawn from the same evidence as well as assessing the credibility of McCaslin and Muhlstein's assertions

23

about their motives and intent, we believe, like the court in *Professional Investors Life Ins. Co. v. Roussel*, 528 F. Supp. 391 (D. Kan. 1981), that it is a job best left to a jury.

> "'The existence or nonexistence of a conspiracy is essentially a factual issue that the jury, not the trial judge, should decide. In this case petitioner may have had to prove her case by impeaching the store's witnesses and appealing to the jury to disbelieve all that they said was true in the affidavits. The right to confront, cross-examine and impeach adverse witnesses is one of the most fundamental rights sought to be preserved by the Seventh Amendment provision for jury trials in civil cases. The advantages of trial before a live jury with live witnesses, and all the possibilities of considering the human factors, should not be eliminated by substituting trial by affidavit and the sterile bareness of summary judgment.'" 528 F. Supp. at 395 (quoting *Fisher v. Shamburg*, 624 F.2d 156, 162 [1980]).

*Plaintiffs have established a triable issue of fact as to whether the alleged conspiracy was the proximate cause of their damages.*

Defendants also argue that summary judgment was appropriate on Plaintiffs' conspiracy claim against Muhlstein because nothing in the record suggests that Muhlstein's alleged conduct caused Plaintiffs to suffer any damages. They claim CSI failed due to existing and ongoing financial difficulties, rather than any conduct by McCaslin or Muhlstein. And they maintain CSI's clients Evergy, Hy-Vee, and Terracon left for other reasons.

Defendants claim the evidence shows Hy-Vee stopped doing business with CSI because the sales staff who managed the account left CSI and took the account with them. They contend Evergy signed its contract with CSI based on CSI's SDVOSB status and terminated its contract with CSI when the company lost that status following McCaslin's departure. And they maintain that Terracon terminated its relationship with CSI largely because the parties could not reach an agreement on a new "company store" inventory model.

24

To begin, Plaintiffs correctly note that Defendants improperly frame the legal question by focusing on whether Muhlstein's actions directly caused CSI to lose customers or value. Kansas law provides that in the context of civil conspiracy, plaintiffs can recover any damages that are the natural and probable result of the conspiracy, including loss in business value. This is true even if a defendant is only liable to a plaintiff as a co-conspirator. See *Beverly*, 211 Kan. at 98-99.

The district court allowed the claims against McCaslin which were the object of the conspiracy to go forward. These included claims for breach of fiduciary duty and breach of duty of loyalty, which alleged that McCaslin's actions related to M2PP and decision to breach the lease and cease payments on the American Express card caused Plaintiffs' damages. As a co-conspirator, Muhlstein would be liable for all damages that were the natural and probable result of the conspiracy. Thus, Plaintiffs argue that Muhlstein is liable for all the damages stemming from both his conduct and McCaslin's, including the loss in CSI's value and the roughly $750,000 in debts that Brinker must now pay due to McCaslin's actions and the failure of CSI.

As explained below, Kansas views the act of one conspirator as the act of all conspirators, and an act by one conspirator is enough to create liability for the rest. *York*, 265 Kan. at 285. Thus, "all participants [in a conspiracy] are directly liable for injuries to others which are the objects of the conspiracy, regardless of whether the participants were active or passive conspirators." 265 Kan. 271, Syl. ¶ 4; see *Beverly*, 211 Kan. at 98-99.

Under Kansas law, breach of fiduciary duty is an "unlawful overt act" upon which a claim of civil conspiracy may be based. See, e.g., *Beverly*, 211 Kan. at 99 (finding co-conspirators liable for breach of fiduciary relationship); *Gillespie v. Seymour*, 14 Kan. App. 2d 563, 571-72, 796 P.2d 1060 (1990), *aff'd in part, rev'd in part* 250 Kan. 123, 823 P.2d 782 (1991); *Idstrom v. Alliance Radiology, P.A.*, No. 115,099, 2017 WL 129926, at *7 (Kan. App. 2017) (unpublished opinion). The district court found a triable issue of fact

on whether McCaslin violated his fiduciary duties and whether that violation caused Plaintiffs damages. Since we find a triable issue of fact as to whether Muhlstein conspired with McCaslin to violate those duties, the jury must decide whether Muhlstein is liable for damages caused by that violation.

Next, Defendants' argument that there is no question of fact as to whether McCaslin or Muhlstein's conduct caused CSI to lose Hy-Vee, Evergy, and Terracon as clients ignores important evidence in the record.

For one, there is a genuine issue of material fact as to whether McCaslin and Muhlstein's conduct caused CSI to lose Hy-Vee as a customer. As Defendants note, CSI lost the Hy-Vee account because the sales staff in charge of the Hy-Vee account resigned from CSI. But the record also shows that three days before these employees resigned, McCaslin and Muhlstein met with them and told them that CSI no longer had the financial capacity to process their orders. McCaslin and Muhlstein suggested that, as a solution, these employees begin processing all Hy-Vee orders through M2PP. We find a reasonable jury could infer from this evidence that this meeting was the reason the employees left, taking Hy-Vee's account with them.

Secondly, contrary to Defendants' suggestion, the evidence also does not conclusively establish that CSI lost Evergy as a client due to CSI losing its SDVOSB certification. While Defendants claim that CSI gained Evergy as a client in November 2018 because CSI gained SDVOSB certification, the evidence shows that CSI gained Evergy as a client in September 2018, two months before it received this certification.

Brinker's deposition testimony also controverts Defendants' assertion. Brinker testified that he met with Evergy in May 2019 and told them CSI was still able to satisfy the contract and, at that point, there was no reason for them not to go forward with the contract. And Defendants fail to acknowledge that CSI's loss of Evergy as a client came

shortly after McCaslin sent a letter to Evergy stating that he had left CSI and started a competing promotion products company. Resolving these facts and the inferences that can be drawn from them in Plaintiffs' favor, there likewise is a question of fact about the cause of the loss of Evergy's account.

As for Terracon, Bitner testified the primary reason it terminated its contract with CSI was the parties' inability to agree on a new inventory model. Terracon's letters to CSI suggest that McCaslin's failure to respond to Terracon's e-mails and voicemails or to provide information on a change in Terracon's account representation that resulted in a transition of their pending orders was damaging its relationship with CSI. And McCaslin was the one who instigated the parties' renegotiation of their inventory model. Given this evidence, we also find a question of fact as to whether the turmoil at CSI, along with McCaslin's actions towards Terracon, contributed to CSI's loss of Terracon as a client.

Finally, Defendants' assertion that the most plausible explanation for CSI's failure is the company's ongoing financial difficulties misapprehends the summary judgment standard. The question is not whether McCaslin and Muhlstein's conduct is the most plausible explanation for Plaintiffs' alleged damages. Rather, the question is whether, resolving the facts and the inferences in Plaintiffs' favor, an issue of fact exists as to whether Plaintiffs were damaged because of the alleged conspiracy. Given the questions about McCaslin's role in the loss of these clients—some of CSI's largest accounts—we cannot find there is no question about whether CSI's failure was proximately caused by the conspiracy.

As for the American Express debt, the record shows McCaslin directed CSI's controller to reverse a payment on that card the same day that he and Muhlstein met with her and instructed her that McCaslin and Muhlstein would be making all the decisions on payments. This reversal was ordered even though the controller said it was not necessary

27

for cash flow reasons. And Muhlstein took part in negotiating a new lease, leaving Brinker liable for the one he had personally guaranteed.

Given the evidence and applying the proper legal standard, we find questions of material fact exist as to whether Plaintiffs' claimed damages were caused by the alleged conspiracy and therefore the district court's summary judgment decision on this claim should be reversed.

*The district court incorrectly required Plaintiffs prove that Muhlstein committed a wrong giving rise to a cause of action independent of the alleged conspiracy.*

Since we are reversing the district court's decision as to Plaintiffs' conspiracy claim against Muhlstein and remanding the claim for further proceedings, we must address a legal mistake in the district court's summary judgment order that could impact those future proceedings. Citing *Stoldt*, 234 Kan. 957, the district court concluded that Kansas law requires Plaintiffs prove that Muhlstein committed a wrong giving rise to a cause of action independent of the alleged conspiracy. But the court misread *Stoldt*. Even though our Supreme Court held in *Stoldt* that an action for civil conspiracy must be supported, as one of its elements, by one or more unlawful overt acts, it did not hold that *each conspirator* must commit an unlawful overt act. 234 Kan. at 967-68.

To establish this element of their conspiracy claim, Plaintiffs need only show that McCaslin's overt wrongful acts were committed in furtherance of an express or implied agreement with Muhlstein or unity of purpose shared with Muhlstein. *Aeroflex Wichita, Inc. v. Filardo*, 294 Kan. 258, 275, 275 P.3d 869 (2012) ("A civil conspiracy claim generally requires a plaintiff to establish '"concert of action or other facts and circumstances from which the natural inference arises that the unlawful, overt acts were committed in furtherance of a common design, intention, or purpose of the alleged conspirators."'"). That is, while Plaintiffs need not show that Muhlstein committed an

28

overt wrongful act, they must still show a meeting of the minds between Muhlstein and McCaslin which McCaslin's overt wrongful acts were designed to further. This meeting of the minds element of the claim prevents someone from becoming inadvertently liable for another's wrongs. *Redelmann v. Claire Sprayway, Inc.*, 375 Ill. App. 3d 912, 924, 874 N.E.2d 230 (2007) (explaining that "'[a]ccidental, inadvertent, or negligent participation in a common scheme does not amount to conspiracy'" and precluding liability under a theory of civil conspiracy for someone "'who innocently performs an act which happens to fortuitously further the tortious purpose of another'").

Defendants advocate for the district court's interpretation of *Stoldt* by pointing to a Tenth Circuit case, *Meyer v. Christie*, 634 F.3d 1152 (10th Cir. 2011), which agreed with the district court's interpretation of Kansas conspiracy law. But Defendants' reliance is misplaced. Not only is *Meyer's* interpretation inconsistent with Kansas precedent which does control our decision, but the Tenth Circuit cited no Kansas caselaw to support its interpretation. Instead, it supported its ruling by citing another Tenth Circuit case, *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241 (10th Cir. 2005). Yet *Pepsi-Cola Bottling Co. of Pittsburg, Inc.* never explained its erroneous interpretation of Kansas law. It simply summarily upheld a district court's decision granting summary judgment for one defendant because the plaintiff had not established an actionable tort committed by that defendant without offering any explanation. 431 F.3d at 1268. Like *Meyer*, we find *Pepsi-Cola Bottling Co. of Pittsburg, Inc.* is unpersuasive and does not control our decision.

That said, we note that the Kansas federal district court properly interpreted Kansas conspiracy law in *Intern. U., United Auto., etc. v. Cardwell Mfg. Co.*, 416 F. Supp. 1267 (D. Kan. 1976) (which is not mentioned in either *Meyer* or *Pepsi-Cola*). Citing several Kansas Supreme Court decisions, the court in *Cardwell Mfg. Co.* remarked that "Kansas has long recognized there may be recovery against all members of a civil conspiracy by one who has suffered damages as a result of actionable conduct done by

29

one or more of the conspirators pursuant to the conspiracy." 416 F. Supp. at 1290 (citing *Beverly*, 211 Kan. 87; *Vaughan*, 195 Kan. 291; *Mosley v. Unruh*, 150 Kan. 469, 95 P.2d 537 [1939]; *Stoner v. Wilson*, 140 Kan. 383, 36 P.2d 999 [1934]; *Hutson v. Imperial Royalties Co.*, 135 Kan. 718, 13 P.2d 298 [1932]). And while *Cardwell Mfg. Co.* is not controlling, it is a proper statement of Kansas conspiracy law.

Our Supreme Court reaffirmed this rule in *York*, when it described the fourth element of a conspiracy claim as requiring a plaintiff to prove "that an unlawful or overt act was committed by one or more of the conspirators." 265 Kan. at 295. The court also found that "all participants are directly liable for injuries to others which are the objects of the conspiracy, regardless of whether the participants were active or passive conspirators." 265 Kan. 271, Syl. ¶ 4. We followed this rule in *Freight Rate Service Co. v. Phil Williams & Assocs., Inc.*, No. 78,408, 1998 WL 36035488, at *5 (Kan. App. 1998) (unpublished opinion), when we held there may be recovery against all members of a conspiracy even though an overt act is performed by only one of the conspirators. 1998 WL 36035488, at *5 (citing *Vaughan*, 195 Kan. 291, Syl. ¶ 3; "Where two or more persons enter into a conspiracy, any act done by either in furtherance of the common design and in accordance with the general plan becomes the act of all, and each conspirator is responsible for such act.").

While, under these circumstances, the district court's legal mistake may not provide an independent reason to reverse its summary judgment ruling, we find it necessary to correct this mistake so the court can properly apply the law on remand.

*Did the district court err in granting summary judgment as to Plaintiffs' tortious interference with contract and business expectancies claims against Muhlstein?*

Plaintiffs next challenge the district court's decision granting summary judgment on their claims of tortious interference with contract and business expectancies against

Muhlstein. They contend the evidence is sufficient for a reasonable jury to find that Muhlstein procured McCaslin's breach of CSI's operating agreement and actively worked with McCaslin to move CSI's clients and business to M2PP.

Defendants claim Plaintiffs' tortious interference claims are merely a repackaging of their civil conspiracy claims and argue that these claims must fail for the same reasons as the civil conspiracy claims. Additionally, they argue Plaintiffs cannot establish the independent requirements of their tortious interference claims.

*Tortious interference with contract*

The elements of tortious interference with contract are: (1) a contract; (2) the wrongdoer's knowledge of it; (3) intentional procurement of its breach; (4) the absence of justification; and (5) damages resulting. *Cohen v. Battaglia*, 296 Kan. 542, 546, 293 P.3d 752 (2013).

No one disputes that the operating agreement is an enforceable contract or that Muhlstein was aware of it. Plaintiffs contend there is also no serious dispute that McCaslin breached the operating agreement, since the district court denied McCaslin's motion for summary judgment on their claim against him for breach of fiduciary duty.

In arguing that summary judgment was appropriate on this claim, Defendants first incorporate their arguments related to Plaintiffs' civil conspiracy claims, specifically their arguments that Plaintiffs fail to establish the existence of the alleged conspiracy or that their damages were caused by the alleged misconduct.

As explained in addressing Plaintiffs' civil conspiracy claims, however, Plaintiffs have established a triable issue of fact as to whether McCaslin formed M2PP to steal clients aways from CSI. And Defendants do not contend that, if true, this alleged conduct

31

would not breach McCaslin's fiduciary duties under the operating agreement. And as explained above, Plaintiffs have established a triable issue of fact as to whether McCaslin and Muhlstein's conduct was the cause of the alleged damages.

The parties' main point of argument then is whether Muhlstein intentionally procured McCaslin's alleged breach of the operating agreement.

As Plaintiffs note, in ruling that their claims for tortious interference with the operating agreement failed as a matter of law, the district court found that Muhlstein only gave advice to McCaslin. There was no evidence Muhlstein did anything to procure McCaslin's breach or otherwise impede McCaslin's ability to perform.

In challenging this ruling on appeal, Plaintiffs essentially argue Muhlstein played such a commanding role in the conspiracy between him and McCaslin that this conduct also amounted to intentional procurement of McCaslin's breach of fiduciary duties. They point out that Muhlstein played an active role in M2PP's creation and the effort to "transition" the Hy-Vee account to M2PP. As they note, Muhlstein gave McCaslin directions about changing CSI's bank account, setting up an account for M2PP, and moving CSI clients to M2PP, and took command of negotiations for CSI's new lease. Plaintiffs refer to the timing of M2PP's creation as well as Muhlstein's admission that while he was not legally a partner in M2PP, the plan was for him to raise investment capital for M2PP or invest in the company himself. And he stated that this became his goal after he could not invest in CSI.

Plaintiffs argue that, faced with this evidence, a jury could reasonably conclude Muhlstein procured McCaslin's breach of his fiduciary duties.

Defendants argue that the issue here is not whether Muhlstein wanted CSI to fail or whether he helped to bring about that result, but whether he took any particular action

32

that impeded McCaslin's ability to perform under the operating agreement. In support, Muhlstein points to American Jurisprudence for the contention that a "defendant may not be held liable where it is found that the breach by the party to the contract rather than the actions by the defendant was the proximate cause of the plaintiff's damage." 44B Am. Jur. 2d, Interference § 12. Muhlstein argues that summary judgment was thus appropriate here because Plaintiffs have identified no evidence in the record that could support a finding that Muhlstein *caused* McCaslin to breach the operating agreement.

The timing of M2PP's creation in relation to Muhlstein's offer to buy into CSI, along with the offer's terms—when viewed alongside the other evidence supporting the existence of the alleged conspiracy—supports an inference that Muhlstein advised McCaslin to create M2PP as a reaction to Brinker's rejection of Muhlstein's offer. These facts, along with the role Muhlstein took in directing McCaslin's actions regarding M2PP and the transition of clients to M2PP, would likewise support an inference that Muhlstein intentionally procured McCaslin's breach of the operating agreement. A reasonable person could conclude that Muhlstein caused McCaslin to breach his fiduciary duties by holding out the potential of investing in M2PP, advising McCaslin as to its creation, and then directing the process of transitioning CSI's clients to M2PP.

We therefore find that a question of fact exists as to whether Muhlstein caused McCaslin to breach his fiduciary duty under the operating agreement. Summary judgment was granted in error on this claim as well.

*Tortious interference with business expectancies*

The elements of tortious interference with an existing or prospective business advantage or relationship are: (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) a reasonable certainty that, except for the

conduct of the defendant, plaintiff would have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) incurrence of damages by plaintiff as a direct or proximate result of defendant's misconduct. *Cohen*, 296 Kan. at 546.

Plaintiffs' tortious interference with business expectancies claim is based on allegations that McCaslin and Muhlstein interfered with CSI's business relationships and expectancies with Hy-Vee, Terracon, and Evergy. In opposing summary judgment below, Plaintiffs argued they provided evidence that McCaslin and Muhlstein's actions directly led to the sales staff in charge of the Hy-Vee account to leave CSI, taking the account with them. They also argued McCaslin and Muhlstein's decision to move CSI to a smaller space impeded CSI's ability to fulfill its contracts with Evergy and Terracon and the internal turmoil created by their actions caused these clients to terminate their contracts with CSI.

In granting summary judgment on this claim, the district court found there was no evidence Muhlstein took any action directed at CSI's customers, interfered with any CSI customer relationships, or engaged in intentional misconduct that caused customers to leave CSI. The district court further found that CSI lost these clients for reasons other than intentional misconduct by McCaslin and Muhlstein.

On appeal, Plaintiffs restate the general facts supporting their conspiracy and tortious interference with contract claims and argue this evidence can defeat summary judgment on both their tortious interference claims against Muhlstein. But since they do not identify any direct action by Muhlstein which caused them to lose Evergy or Terracon as clients, we find whether Muhlstein tortiously interfered with CSI's business expectancies with these clients to be a closer question. We agree with the district court that Plaintiffs' general allegations of internal turmoil and office space are too tenuous to present a triable jury question.

Still, we find a triable question of fact as to whether Muhlstein's intentional misconduct caused CSI to lose Hy-Vee as a client. Following their attempts to convince Hy-Vee to add M2PP as another vendor as part of their plan to transition all Hy-Vee orders to M2PP (purportedly to avoid CSI's credit and working capital issues), McCaslin and Muhlstein met with the two salespersons in charge of the account. McCaslin stated that the purpose of this meeting was to inform them that, because of the size of the orders, CSI lacked the financial capacity to process the orders, and to discuss switching the Hy-Vee account to M2PP to solve this problem. Three days later, both salespeople resigned, taking the Hy-Vee account with them.

These facts could lead to an inference that the salespeople in charge of the Hy-Vee account left CSI in response to Muhlstein and McCaslin's effort to get them to switch the account to M2PP. As explained in the discussion of Plaintiffs' conspiracy claim, a question of fact exists about whether McCaslin and Muhlstein were engaged in a conspiracy to shift CSI's customers to M2PP for their own benefit. Accordingly, we find there is a question of fact on whether Muhlstein's intentional misconduct caused these employees to resign and CSI to lose Hy-Vee as a client as a result.

Thus, we find that summary judgment was not appropriate on Plaintiffs' tortious interference with business expectancies claim, but only regarding Plaintiffs' business expectancies with Hy-Vee. We affirm the decision granting summary judgment on Plaintiffs' claims related to their business expectancies with Evergy and Terracon.

*Did the district court err in granting summary judgment on Plaintiffs' KUTSA claims against Muhlstein?*

Plaintiffs also argue the district court erred in granting summary judgment on their claims against Muhlstein for violating the KUTSA. They maintain the evidence is

sufficient for a jury to find that Muhlstein, along with McCaslin, misappropriated CSI's trade secrets to help them in starting a new, competing business.

Defendants contend these claims must fail because Plaintiffs have not shown the information at issue constituted "trade secrets" or that Muhlstein "misappropriated" this information under the KUTSA.

Under the KUTSA, plaintiffs are entitled to recover damages for misappropriation of trade secrets. K.S.A. 60-3322(a). The KUTSA defines "'[m]isappropriation'" as:

"(i) [A]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

"(ii) disclosure or use of a trade secret of another without express or implied consent by a person who

(A) used improper means to acquire knowledge of the trade secret; or

(B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was

(I) derived from or through a person who had utilized improper means to acquire it;

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake." K.S.A. 60-3320(2).

"'Trade secret,'" in turn, is defined as:

"[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:

36

(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." K.S.A. 60-3320(4).

In granting summary judgment on Plaintiffs' KUTSA claims against Muhlstein, the district court found that McCaslin was authorized by the operating agreement to share the information at issue with Muhlstein, Muhlstein maintained the confidentiality of this information, and the evidence did not support the existence of Plaintiffs' alleged conspiracy.

*A question of fact exists as to whether the information at issue constitutes trade secrets.*

To begin, Defendants argue Plaintiffs identify no information at issue that meets the definition of a "trade secret." They compare this case to *Dodson Intern. Parts, Inc. v. Altendorf*, 347 F. Supp. 2d 997, 1012 (D. Kan. 2004), *modified on reconsideration* No. 00-4134SAC, 2005 WL 475363 (D. Kan. 2005) (unpublished opinion), which found summary judgment appropriate when a plaintiff made no effort to identify the specific information involving a trade secret or the specific act constituting misappropriation. They also rely on *Dow Chemical Canada Inc. v. HRD Corp.*, 909 F. Supp. 2d 340, 347-48 (D. Del. 2012), which held that vague and conclusory statements that a "concept" shared with a competitor constituted a trade secret were not sufficient to survive summary judgment.

In response, Plaintiffs contend they have consistently identified the alleged trade secrets at issue and cite specific e-mail attachments sent from McCaslin to Muhlstein, which included CSI information such as company financial records, tax records, internal

financial statements, a PowerPoint laying out CSI's business tactics and strategy for landing Evergy as a client, and client account information and projected revenue.

Looking to the definition of "trade secret" under the KUTSA, we find a jury could reasonably conclude these documents constitute information that (1) derived independent economic value from not being generally known and not readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use and (2) was the subject of reasonable efforts to maintain its secrecy.

*A question of fact exists as to whether Muhlstein misappropriated this information.*

Turning to the definition of "misappropriation," Defendants note the parties agree that McCaslin voluntarily sent the information at issue to Muhlstein while he was acting as CSI's manager. Thus, they claim, the first question is whether McCaslin used improper means to acquire the information or owed a duty to CSI to maintain its secrecy or limit its use. They argue he did not, pointing out the operating agreement granted McCaslin unlimited authority to share information about CSI with third parties.

Defendants also contend that, even if McCaslin exceeded his authority under the operating agreement in sharing this information with Muhlstein, Plaintiffs would still need evidence that Muhlstein *used* an alleged trade secret for him to be liable under the KUTSA. They argue no such evidence exists, as the record does not support Plaintiffs' alleged conspiracy and instead shows that McCaslin provided the information at issue to Muhlstein to advance CSI's business operations.

Plaintiffs argue that, given Defendants' unlawful conspiracy, Muhlstein knew or had reason to know the financial records and other trade secrets he was receiving from McCaslin were being provided by improper means—i.e., in violation of the operating agreement. They argue that if there is a question of fact on the existence of their alleged

38

conspiracy, a question of fact must also exist as to whether McCaslin exceeded his authority under the operating agreement in providing Muhlstein with this information. And they claim the timeline of Muhlstein's receipt of CSI trade secrets, from November 2018 through April 2019, when combined with the evidence tending to show that McCaslin and Muhlstein were scheming to steal CSI's business, is enough for a jury to find that McCaslin and Muhlstein were not using this information for CSI's benefit. We agree.

As a starting point, Defendants' suggestion that the operating agreement granted McCaslin unlimited authority to share information about CSI with third parties is based on an unreasonably narrow view of that agreement. Although the operating agreement granted McCaslin wide authority to engage third parties for CSI's benefit, it also imposed a duty on him to act as CSI's fiduciary. Accordingly, he could not disclose CSI trade secrets to third parties if his purpose in disclosing the information was to harm CSI and benefit himself.

Thus, a jury could find Muhlstein violated the KUTSA if it finds McCaslin disclosed trade secrets to Muhlstein for use in starting M2PP and stealing CSI's value and business and Muhlstein used them for this purpose.

Resolving the facts and inferences that can reasonably be drawn from them in Plaintiffs' favor, we find a question of fact exists as to whether Muhlstein misappropriated the alleged trade secrets. Because of the overlap between the challenged disclosures and the time during which McCaslin and Muhlstein were setting up M2PP and attempting to transition clients—as well as the fact that one of the documents was titled "Client Movement to M2"—a jury could find at least some of these disclosures were made to help form M2PP. And given that McCaslin stated he and Muhlstein were focusing on moving the largest clients to M2PP, it is reasonable to infer that they used CSI company information in prioritizing which clients to transition.

As a result, we find there is also a triable question of fact as to whether Muhlstein misappropriated CSI trade secrets. The district court erred in granting summary judgment on this claim.

*Did the district court err in granting summary judgment on Plaintiffs' claims against Sprout and Access Asia?*

As a final matter, we must address Plaintiffs' claims against Muhlstein's companies, Sprout and Access Asia.

Across all issues on appeal, Plaintiffs mainly focus their arguments on their claims against Muhlstein. Yet, they also appeal from the district court's grant of summary judgment as to their claims against Sprout and Access Asia. But rather than making specific arguments on these claims, they merely seek through a footnote to incorporate their arguments about Muhlstein for each claim against his companies. They argue that, given the district court's judgment, their points on appeal apply equally to Muhlstein, Sprout, and Access Asia. Thus, they claim, if the judgment for Muhlstein is reversed, so too must be the judgment for these entities.

Defendants correctly note that Sprout and Access Asia are separate entities from Muhlstein, and Plaintiffs are required to tailor their allegations to support claims against those companies. Plaintiffs cite no evidence which shows or from which a reasonable inference could be drawn that shows: (1) Access Asia participated in the alleged conspiracy; (2) Access Asia's act of submitting invoices caused CSI to lose customers as would be necessary to support a claim for tortious interference with business expectancies; or (3) Sprout or Access Asia had any involvement with any alleged trade secret. Further, no matter what Muhlstein is alleged to have done as an individual, for Sprout or Access Asia to be vicariously liable for his actions, there would need to be evidence that Muhlstein was acting within the scope of his agency on behalf of those

40

entities when he took those alleged actions. See, e.g., Restatement (Third) of Agency § 7.04, comment b (2006). But again, Plaintiffs cite no such evidence.

Plaintiffs have not separately briefed their arguments about Sprout and Access Asia, and the success of these claims does not merely turn on the success of their claims against Muhlstein. Plaintiffs have offered no argument to explain why the district court's decision on their claims against these companies, specifically, was in error. We thus consider their arguments as to Sprout and Access Asia abandoned for lack of sufficient briefing. We affirm the district court's decision granting summary judgment to these companies.

CONCLUSION

The purpose of summary judgment is to avoid the delay and expense of a trial when there are no factual disputes for a jury to determine. *Lawrence v. Deemy*, 204 Kan. 299, 301, 461 P.2d 770 (1969); *Secrist v. Turley*, 196 Kan. 572, 575, 412 P.2d 976 (1966).

Where, like here, we have conflicting inferences drawn from the same evidence and credibility assessments which must be made about parties' motives and intent, then we are presented with the very factual disputes for which jury trials were created to determine.

We therefore reverse the district court's summary judgment decision as to Plaintiffs' claims against Muhlstein for conspiracy, tortious interference with contract, tortious interference with Plaintiffs' business expectancy with Hy-Vee, and violation of the KUTSA. We remand these claims for further proceedings. But we affirm its decision on Plaintiffs' claims against Sprout and Access Asia and Plaintiffs' claims against

41

Muhlstein for tortious interference with their business expectancies with Terracon and Evergy.

Affirmed in part, reversed in part, and remanded for further proceedings.